UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| STEPHEN J. RATCLIFFE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-00234-JAW |
| | ) | |
| BRP U.S. INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

A manufacturer and a dealer of utility task vehicles seek summary judgment on a plaintiff's negligence and strict liability claims arising out of an incident in which the plaintiff's utility task vehicle rolled onto its side and crushed his arm. Concluding that there is a triable issue as to whether the plaintiff understood how his conscious decision to purchase a vehicle without window nets affected occupant safety, the Court denies the defendants' motion as to the plaintiff's design defect theory. Likewise, the Court denies the defendants' motion as to the plaintiffs' failure-to-warn theory because the plaintiff has put forward sufficient evidence for a reasonable juror to find that the allegedly inadequate warnings proximately caused the plaintiff's injuries.

## I.   BACKGROUND

On July 2, 2020, Stephen J. Ratcliffe filed a civil action against BRP U.S. Inc. (BRP) and Tidd's Sport Shop, Inc. (Tidd's).[1]  *Compl.* (ECF No. 1).  Mr. Ratcliffe

---

[1]     Mr. Ratcliffe's complaint originally included a third defendant, ABC Corporation, a fictional placeholder entity for any additional defendants found during discovery. *Pl.'s Resp. to the Ct.'s Order to Show Cause* (ECF No. 19).  On October 19, 2020, Judge Singal, then presiding judge, dismissed all

brought tort claims against BRP and Tidd's based on an incident in which an off-road vehicle rolled onto its side and crushed his arm. *Id.* Counts I and III of the Complaint assert negligence claims against BRP and Tidd's, respectively. *Id.* ¶¶ 17-26, 41-48. Counts II and IV of the Complaint assert strict liability claims pursuant to 14 M.R.S. § 221 against BRP and Tidd's, respectively. *Id.* ¶¶ 27-40, 49-57.

On August 10, 2020, Tidd's answered the Complaint and asserted crossclaims against BRP for contribution and indemnification. *Def. Tidd's Sport Shop, Inc.'s Answer to Pl.'s Compl., Cross Cl.* (ECF No. 11). On August 11, 2020, BRP answered the Complaint. *Def. BRP U.S. Inc.'s Answer to Compl.* (ECF No. 12). On August 17, 2020, BRP answered Tidd's crossclaims and asserted its own crossclaims against Tidd's for contribution and indemnification. *Def. BRP U.S. Inc.'s Answer to Tidd's Sport Shop, Inc.'s Cross Cl. and Cross Cl. Against Tidd's Sport Shop, Inc.* (ECF No. 13). On September 9, 2020, Tidd's answered BRP's crossclaims. *Def. Tidd's Sport Shop, Inc.'s Answer to BRP U.S., Inc.'s Cross Cl. and Jury Demand* (ECF No. 14).

After a protracted discovery period involving multiple discovery disputes, on April 3, 2023, BRP filed a notice of intent to move for summary judgment pursuant to District of Maine Local Rule 56(h). *Def. BRP US Inc.'s Notice of Intent to File Mot. for Summ. J.* (ECF No. 95). On May 17, 2023, the parties filed a stipulated record. *Local Rule 56(h) Stipulated R.* (ECF No. 113) (*Stipulated R.*). That same day, the

---

claims against ABC Corporation because "it is not apparent that this Court would have jurisdiction over Plaintiff's claims against this entity" and because the Scheduling Order provided Mr. Ratcliffe with the "opportunity to amend his Complaint and join any additional defendants identified via discovery." *Order* (ECF No. 21). Mr. Ratcliffe never sought to add any other defendants, and thus BRP and Tidd's are the only Defendants.

parties filed several additional attachments to the stipulated record. *Additional Attachs.* (ECF No. 114); *Additional Attachs.* (ECF No. 115); *Additional Attachs.* (ECF No. 116); *Additional Attachs.* (ECF No. 117); *Additional Attachs.* (ECF No. 118); *Additional Attachs.* (ECF No. 119); *Additional Attachs.* (ECF No. 120); *Additional Attachs.* (ECF No. 121). On May 26, 2023, the parties filed a stipulated statement of material facts. *Stipulated Statement of Material Facts* (ECF No. 122) (JSMF).

Also on May 26, 2023, BRP filed its motion for summary judgment, a separate memorandum of law, and its own statement of material facts.[2] *Def. BRP's Mot. for Summ. J.* (ECF No. 123) (*BRP's Mot.*); *Mem. of Law in Support of Def. BRP's Mot. for Summ. J.* (ECF No. 124) (*BRP's Mem. of Law*); *Def. BRP's Statement of Material Facts in Support of Its Mot. for Summ. J.* (ECF No. 125) (DSMF). That same day, Tidd's filed a request to join BRP's motion for summary judgment. *Def. Tidd's Sport Shop, Inc.'s Mot. for Summ. J.* (ECF No. 126) (*Tidd's Mot.*).[3]

On June 15, 2023, Mr. Ratcliffe filed a supplemental record. *Pl.'s Suppl. Stipulated R.* (ECF No. 128) (*Pl.'s R.*). On June 16, 2023, Mr. Ratcliffe filed a response to BRP's motion for summary judgment and a separate memorandum of law. *Pl. Stephen J. Ratcliffe's Obj. to Def. BRP's Mot. for Summ. J.* (ECF No. 129) (*Pl.'s Opp'n*

---

[2]    As explained below, BRP seeks summary judgment on Mr. Ratcliffe's failure-to-warn theory and his design defect theory insofar as he claims the off-road vehicle's lack of window nets rendered it defective. At oral argument, counsel for BRP conceded that Mr. Ratcliffe raises two additional design defect theories not addressed in BRP's motion for summary judgment. *Tr. of Proceedings* at 48:4-11 (ECF No. 142) (*Oral Arg. Tr.*). BRP's counsel further clarified that it is only seeking partial summary judgment on the theories addressed in its motion. *Id.* at 48:12-15.

[3]    Although titled Tidd's motion for summary judgment, in fact, Tidd's merely joined BRP's motion, incorporating BRP's statement of facts and memorandum of law, and argued that it is entitled to summary judgment "[f]or the same reasons set forth in BRP's motion papers." *Tidd's Mot.* at 1. Tidd's raised no facts or argument not contained in BRP's motion and its motion thus stands or falls on BRP's arguments to the extent they are applicable to Tidd's.

to BRP's Mot.); *Pl. Stephen J. Ratcliffe's Mem. of Law in Support of His Obj. to Def. BRP's Mot. for Summ. J.* (ECF No. 131) (*Pl.'s Mem. of Law*). That same day, Mr. Ratcliffe filed his response to BRP's statement of material facts, *Pl.'s Opposing Statement of Material Facts* at 1-16 (ECF No. 130) (PRDSMF), and his statement of additional material facts. *Pl.'s Opposing Statement of Material Facts* at 16-39 (ECF No. 130) (PSAMF). Also on June 16, 2023, Mr. Ratcliffe filed a response to Tidd's request to join BRP's motion. *Pl. Stephen J. Ratcliffe's Obj. to Def. Tidd's Sport Shop, Inc.'s Mot. for Summ. J.* (ECF No. 132) (*Pl.'s Opp'n to Tidd's Mot.*).

On June 30, 2023, BRP filed a reply in support of its motion for summary judgment and a response to Mr. Ratcliffe's statement of additional material facts. *Def. BRP's Reply in Supp. of Mot. for Summ. J.* (ECF No. 133) (*BRP's Reply*); *BRP's Reply Statement of Material Facts* (ECF No. 134) (DRPSAMF). That same day, Tidd's responded to Mr. Ratcliffe's opposition to its request to join BRP's motion for summary judgment. *Def. Tidd's Sport Shop, Inc.'s Reply to Pl.'s Obj. to Def.'s Mot. for Summ. J.* (ECF No. 135) (*Tidd's Reply*).

On July 6, 2023, Mr. Ratcliffe requested oral argument on BRP's motion for summary judgment and Tidd's request to join BRP's motion. *Pl.'s [Local Rule] 7(e) Mot. for Oral Arg. on Defs.' Mots. for Summ. J.* (ECF No. 136). On July 10, 2023, Mr. Ratcliffe responded to BRP's objections to his statement of additional material facts. *Pl.'s Resp. to Def. BRP's Reply Statement of Material Facts* (ECF No. 137) (*Pl.'s Reply to DRPSAMF*).

On August 30, 2023, the case was transferred from Judge Singal to this Judge. That same day, the Court granted Mr. Ratcliffe's motion for oral argument. *Order* (ECF No. 138). The Court held oral argument on April 30, 2024. *Min. Entry* (ECF No. 141). An official transcript of oral argument was docketed on May 22, 2024. *Tr. of Proceedings* (ECF No. 142) (*Oral Arg. Tr.*).

## II.   STATEMENT OF FACTS

### A.   Overview of the Case

This is a products liability action initiated on July 2, 2020. JSMF ¶ 1; DSMF ¶ 1; PRDSMF ¶ 1. The product at issue is a 2019 Can-Am Turbo Maverick X3 side-by-side vehicle (Subject Vehicle), Serial Number 3JBVGAY40KK002165. JSMF ¶ 2; DSMF ¶ 2; PRDSMF ¶ 2. The Subject Vehicle was distributed by BRP and purchased by Mr. Ratcliffe from Tidd's on July 30, 2019. JSMF ¶¶ 3-4; DSMF ¶¶ 3-4; PRDSMF ¶¶ 3-4. The following photograph—taken by Mr. Ratcliffe's expert, Dr. Stephen Batzer, during a post-accident inspection—depicts the Subject Vehicle:



5

DSMF ¶ 9; PRDSMF ¶ 9.

### B.   BRP's Development of the Subject Vehicle

While field testing a Maverick X3 prototype vehicle on February 16, 2016, BRP documented that the operator lost control of the vehicle and rolled it as follows: "While making the large left hand sweeping turn in the renegade s-turns the pilot lost . . .. During the roll-over the Whip Flag was broken off."  PSAMF ¶ 46; DRPSAMF ¶ 46.[4] The February 16, 2016 rollover occurred after the vehicle had been driven for approximately 1.6 hours and 50 kilometers.  PSAMF ¶ 47; DRPSAMF ¶ 47.

While field testing a Maverick X3 prototype vehicle on March 16, 2016, BRP documented that the driver's side taillight fell off while running, with the probable cause being that "[t]he unit has been rolled on its side 2 or 3 times.  Damage to the fender and light led to this failure."  PSAMF ¶ 48; DRPSAMF ¶ 48.

While field testing a Maverick X3 prototype vehicle on March 30, 2016, BRP documented that the operator lost control of the vehicle and rolled it as follows: "While in the north s-turns the pilot lost control of the unit causing it to roll onto its driver's side.  Unit was righted and towed back to the shop for inspection."  PSAMF ¶ 49; DRPSAMF ¶ 49.

During his deposition, Bruce Codere, the project manager of the Maverick X3 from 2016 to 2021, offered the following testimony:

---

[4]     The first part of PSAMF ¶ 46 is an incomplete sentence as set forth above.  *See* PSAMF ¶ 46. The statement is, however, an exact duplicate of an incomplete sentence in BRP's Rapport D'Incidents. *See Pl.'s R.*, Attach. 1, *Rapport D'Incidents et D'Entretien Par Système* at 1.

The paragraph numbers in Mr. Ratcliffe's statement of additional material facts begin at 46, presumably because BRP's statement of material facts contains 45 paragraphs.  *See generally* DSMF ¶¶ 1-45.

Q: So, all I'm trying to get at is Can-Am understood back in the 2015 and 2016 time period that it was developing this X3 that rollovers occurred?

A: Yes, that's why we put the driving or the warning of having your hands inside the vehicle at all times.

PSAMF ¶ 50; DRPSAMF ¶ 50.

One of Mr. Ratcliffe's experts, Dr. Robert Nobilini, referred to U.S. Patent No. 5290086, titled "Window Net for Racing and Off-Road Vehicles," which Curt L. Tucker invented in 1992 and published in 1994 (Tucker Patent).   PSAMF ¶ 76; DRPSAMF ¶ 76.  The Tucker Patent provides:

> The function of window nets is to retain a driver's head, left shoulder, and left arm within the area defined by the roll bar cage in the event of a roll-over or side impact.  The window nets are also to keep rocks, car parts, and other foreign objects from entering the space defined by the roll bar cage.
> . . .
> Window nets . . . are used to keep hands, arms, shoulders and heads inside the area surrounded by the roll bar cage [] during roll-overs and crashes with side impacts.  Such window nets [] are fastened to the roll bar cage by a lower bar [] and an upper bar [].
> . . .
> There are numerous former race car drivers with mangled left arms and hands who could have avoided injury using window nets.
> . . .
> The window net [] of the present invention . . . has a woven mesh [].  This mesh is made of 100 percent polyester, multiple thread, cords that are woven into a mesh . . ..
> . . .
> The woven mesh [] is similar to a home window screen in that a person can see through the mesh reasonably well.

PSAMF ¶ 77; DRPSAMF ¶ 77.

In 2017, BRP started designing window nets for the Maverick X3.  PSAMF ¶ 78; DRPSAMF ¶ 78.  BRP internally referred to the Maverick X3 window nets as "Nascar style" window nets.  PSAMF ¶ 79; DRPSAMF ¶ 79.  As part of BRP's design

process for the "Nascar style" nets, it researched patents related to window nets, and BRP is aware that there is a patent in the U.S. patent system for "Nascar style" nets or something "substantially similar."  PSAMF ¶¶ 80-81; DRPSAMF ¶¶ 80-81.  BRP's "Nascar style" nets are made of 100% polyester "heavy duty dipped mesh," with a 100% PVC coating.  PSAMF ¶ 86; DRPSAMF ¶ 86.  Below is an image of BRP's final blueprints for the "Nascar style" nets:



PSAMF ¶ 85; DRPSAMF ¶ 85.

In 2018, BRP released window nets for sale as an accessory to the Maverick X3.  PSAMF ¶ 87; DRPSAMF ¶ 87.  Below is a photograph of the Maverick X3 equipped with BRP's "Nascar style" nets:



PSAMF ¶ 88; DRPSAMF ¶ 88.

While developing the "Nascar style" nets, BRP performed multiple tests, including a physical test to determine whether "[t]he net can hold passenger body parts during [a] roll over." PSAMF ¶ 82; DRPSAMF ¶ 82. BRP evaluated the "Nascar style" nets to have "PASS[ED]" this test. PSAMF ¶¶ 83-84; DRPSAMF ¶¶ 83-84.

When BRP was designing the "Nascar style" nets, it researched similarly styled nets offered by its competitors. PSAMF ¶ 89; DRPSAMF ¶ 89. BRP recognizes the Honda Talon side-by-side as a similar vehicle to the Maverick X3. PSAMF ¶ 90; DRPSAMF ¶ 90. One of Mr. Ratcliffe's experts, Dr. Batzer, provided the following opinions related to the side-by-side/UTV industry and the Honda Talon:

> The lack of effective window netting is a near industry-wide problem. That is, manufacturers such as Arctic Cat, Can-Am, HiSun, John Deere, Polaris, and Yamaha sell UTVs without full coverage window nets. In the same way, crossbow manufacturers, for years, manufactured and sold crossbows without effective bowstring flight rail guards to prevent finger injuries by the moving bowstring. The crossbow industry changed, and now virtually all crossbows that are manufactured are

equipped with effective bowstring guards. A similar change should come to the UTV industry. One industry leader in this is Honda. Set forth below is a photograph of the 2019 Honda Talon, which has an effective window net design; it covers nearly the entire side window portal. This is another two seat side-by-side which is designed to be a pure sport vehicle similar to the Maverick X3.

PSAMF ¶ 91; DRPSAMF ¶ 91.  The owner's manual for the 2019 Honda Talon

contains the following discussion regarding window netting:

> Your Honda SXS is equipped with side nets to prevent branches, or other debris from getting inside the driver's compartment, and to keep the driver's and passenger's hands and arms inside the occupant protective structure (OPS) if the vehicle ever tips or overturns.
>
> The side nets are secured to the OPS with side net D-rings and side net buckles. To function properly, the side nets should be tight. If a side net is loose, tighten the belts on the side net D-rings.
>
> Be sure the side nets are properly latched before driving your Honda SXS, and never remove side nets from the vehicle. Inspect the condition of the side net and its mounting hardware. If there is wear, deterioration, damage, or they do not latch and tighten securely, see your dealer for repair or replacement.

PSAMF ¶ 91; DRPSAMF ¶ 91.  Below is an image of the Honda Talon equipped with

window netting:



2019 Honda Talon promotional photo showing occupant protection window netting.

10

PSAMF ¶ 91; DRPSAMF ¶ 91.

In 2019, BRP sold the "Nascar nets" as an accessory.  PSAMF ¶ 92; DRPSAMF ¶ 92.  During this timeframe, BRP marketed certain accessories for the Maverick X3 as "MUST HAVE" accessories (e.g., front lower door panels), but BRP did not market the "Nascar nets" as a "MUST HAVE" accessory.  PSAMF ¶ 94; DRPSAMF ¶ 94.  In 2019, BRP did not market the "Nascar nets" as having any safety purpose; instead, BRP marketed the window nets as follows:

- Window mesh screen for added protection from wind.

- Can be easily lowered in seconds.

- Sold in pairs.

PSAMF ¶ 93; DRPSAMF ¶ 93.

On or about July 21, 2020, BRP posted a "Can-Am Tech Talk Tuesday" video to the Can-Am Facebook channel, titled "How to install Maverick X3 Front Window Nets."  PSAMF ¶ 97; DRPSAMF ¶ 97.  The Tech Talk Tuesday video features one of BRP's Can-Am brand ambassadors, Hubert Rowland, demonstrating and discussing the installation of "Nascar style" window nets on a Maverick X3.  PSAMF ¶ 98; DRPSAMF ¶ 98.  In the Tech Talk Tuesday video, Mr. Rowland states the following:

> So these Can-Ams are awesome fast, awesome fun, and Travis tells everybody: keep your arms inside the vehicle at all times.  Just in case, or a good way to do that is Can-Am door nets.  Can-Am makes these door nets on their accessory line . . . very simple thing to help guarantee your arms will stay inside the vehicle just in case an accident happens.
> . . .
> Can-Am accessories door nets, keep your hands inside the ride at all times.

PSAMF ¶ 99; DRPSAMF ¶ 99.

The listed price of the Subject Vehicle at the time of Mr. Ratcliffe's purchase was $20,999.00, and Tidd's sold it to Mr. Ratcliffe for $19,400 before adjusting for a $3,000 rebate, bringing Mr. Ratcliffe's purchase price to $16,400. PSAMF ¶ 101; DRPSAMF ¶ 101. BRP's cost of manufacturing a set of two "Nascar style" window nets was approximately $46.93. PSAMF ¶ 102; DRPSAMF ¶ 102.

### C. Stephen J. Ratcliffe's Purchase of the Subject Vehicle

Mr. Ratcliffe began operating dirt bikes and all-terrain vehicles (ATVs) around the age of seven. DSMF ¶ 10; PRDSMF ¶ 10. Mr. Ratcliffe had driven side-by-side vehicles—sometimes called utility task vehicles (UTVs)—at least a dozen times before he purchased the Subject Vehicle. DSMF ¶ 11; PRDSMF ¶ 11. Before purchasing the Subject Vehicle, Mr. Ratcliffe had ridden in UTVs with window netting or webbing, including during trips to Mexico and Vermont. DSMF ¶ 18; PRDSMF ¶ 18.

Mr. Ratcliffe had been considering purchasing a UTV for over a year before he decided to purchase the Subject Vehicle. DSMF ¶ 13; PRDSMF ¶ 13. Before he decided to purchase the Subject Vehicle, Mr. Ratcliffe conducted online research regarding Can-Am UTVs and other UTVs during which he observed and watched videos of UTVs equipped with "window netting" or "webbing." DSMF ¶¶ 14-16; PRDSMF ¶¶ 14-16. Mr. Ratcliffe also watched numerous videos of Maverick X3 drivers performing maneuvers, including donuts, without incident of rollover and in

vehicles that did not appear to be equipped with window nets.[5]   PSAMF ¶ 60;

DRPSAMF ¶ 60.

Mr. Ratcliffe visited Tidd's twice in connection with his purchase of the Subject

Vehicle, first on July 29, 2019, and again on July 30, 2019.  DSMF ¶ 12; PRDSMF

¶ 12.  Before purchasing the Subject Vehicle, Mr. Ratcliffe conducted online research

regarding the availability of aftermarket window nets or webbing that would fit the

Subject Vehicle and discussed the availability of window nets or webbing with the

salesperson at Tidd's.[6]   DSMF ¶ 19; PRDSMF ¶ 19.  Mr. Ratcliffe also saw "used"

UTVs at Tidd's dealership with window netting or webbing.  DSMF ¶ 17; PRDSMF

¶ 17.  Before purchasing the Subject Vehicle, Mr. Ratcliffe was aware that

aftermarket window nets or webbing could be purchased and affixed to the Subject

Vehicle.  DSMF ¶ 20; PRDSMF ¶ 20.  Mr. Ratcliffe testified that, before purchasing

the Subject Vehicle, he "knew that [window nets or webbing] was something that [he]

desired to have from what [he had] seen" and that the availability of window netting

---

[5]     BRP denies PSAMF ¶ 60, which relies solely on Mr. Ratcliffe's affidavit, arguing that
"Plaintiff's affidavit is improper and should be struck from the record because it misstates the factual
record and was drafted after BRP moved for summary judgment."  DRPSAMF ¶ 60.  In accordance
with the Court's later discussion of post-summary judgment affidavits, the Court rejects BRP's denial,
as BRP has not shown that Mr. Ratcliffe's affidavit contradicts his prior testimony.
[6]     DSMF ¶ 19 reads: "Before purchasing the Subject Vehicle, Plaintiff discussed the availability
of window nets or webbing with the salesperson at Tidd's and another local dealership, Houlton Power
Sports, and Plaintiff also conducted online research regarding the availability of aftermarket window
nets or webbing that would fit the Subject Vehicle."  Mr. Ratcliffe interposed a qualified response to
DSMF ¶ 19, arguing that "Defendant's record citations do not support its statement that Plaintiff
discussed the availability of window nets or webbing with Houlton Power Sports; the record citations
only support that he looked at vehicles at Houlton Power Sports."  PRDSMF ¶ 19.
      The Court reviewed the record citations supporting DSMF ¶ 19 and found no suggestion that
Mr. Ratcliffe discussed the availability of window nets or webbing with anyone at Houlton Power
Sports.  The Court therefore strikes the reference to Houlton Power Sports from DSMF ¶ 19 and admits
the remainder of the statement.

was "a high consideration" and "something [he] wanted."  DSMF ¶¶ 21-22; PRDSMF ¶¶ 21-22.

Prior to purchasing the Subject Vehicle, Mr. Ratcliffe was assured by Richard J. Tidd, the owner of Tidd's Sport Shop, Inc., that the Maverick X3 was unlikely to roll over because it had a "low center of gravity," and that in order to roll it a driver would "have to get really nuts with it."[7]  PSAMF ¶ 59; DRPSAMF ¶ 59.  On July 29 or July 30, 2019, an owner or employee of Tidd's told Mr. Ratcliffe that the window nets offered by BRP for the Maverick X3 were "almost like a screen of a window . . . to keep dust and debris out."[8]  PSAMF ¶ 95; DRPSAMF ¶ 95.  On or about July 29, 2019, the following conversation was video recorded at Tidd's after Mr. Ratcliffe test drove the Subject Vehicle:

> **Mr. Ratcliffe:** As I was coming around the corner, I actually touched the gas and it goes [indicating acceleration with a hand gesture].
> **Richard Tidd:** Yeah it pulls like gangbusters.
> **Mr. Ratcliffe:** I was afraid, I was afraid to roll it though, so I was like, no, no, no.

---

[7]    BRP denies PSAMF ¶ 59, which relies in part on Mr. Ratcliffe's affidavit, arguing that "Plaintiff's affidavit is improper and should be struck from the record because it misstates the factual record and was drafted after BRP moved for summary judgment."  DRPSAMF ¶ 59.  In accordance with the Court's later discussion of post-summary judgment affidavits, the Court rejects BRP's denial, as BRP has not shown that Mr. Ratcliffe's affidavit contradicts his prior testimony.

[8]    BRP interposed a qualified response to PSAMF ¶ 95.  DRPSAMF ¶ 95.  BRP admitted that PSAMF ¶ 95 "represents a conversation with an owner or employee of Tidd's Sport Shop."  *Id.*  However, BRP continued, "to the extent that Plaintiff asserts that the only description of the window nets was [to] 'keep dust and debris out,' such assertion is denied as it is not supported by the factual record."  *Id.*

Under District of Maine Local Rule 56(d), a party replying to a statement of material facts "shall support each denial or qualification by a record citation as required by subsection (f) of this rule."  D. ME. LOC. R. 56(d).  Local Rule 56(f) further provides that an appropriate record citation includes "a citation to the specific page or paragraph of identified record material supporting the assertion."  D. ME. LOC. R. 56(f).

BRP's qualification did not include a record citation in violation of Local Rule 56(d).  The Court reviewed the record citation offered by Mr. Ratcliffe in support of PSAMF ¶ 95 and concludes that it does not support BRP's denial.  Because the Court has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts," the Court rejects BRP's qualification.  *Id.*

> **Mr. Tidd:** It's a, it's a beauty of those things, they are low to the ground. Your center of gravity is.
> **Mr. Ratcliffe:** You can't roll that easy?
> **Mr. Tidd:** It would take a bunch, I mean you'd have to get really nuts with it.
> **Mr. Ratcliffe:** Okay.
> **Mr. Tidd:** If you get in a [Polaris] RZR or a [Polaris] Ranger, you'll see, you're sitting [up] quite a bit higher.
> **Mr. Ratcliffe:** Mm-hmm.
> **Mr. Tidd:** The X3, you're actually sitting right down, right in it, yeah.
> **Mr. Ratcliffe:** I like that.
> **Mr. Tidd:** Oh, it's a blast to ride . . ..

PSAMF ¶ 96; DRPSAMF ¶ 96.

At the time of purchasing the subject vehicle, Mr. Ratcliffe did not know that BRP's Can-Am accessory window nets, which did not come with the vehicle, were designed to keep body parts inside the vehicle in the event of a rollover.[9]  PSAMF ¶ 61; DRPSAMF ¶ 61.  Mr. Ratcliffe believed that BRP's Can-Am accessory window nets were designed to keep dust and debris out of the vehicle, not to keep body parts inside.[10]  PSAMF ¶ 62; DRPSAMF ¶ 62.

At the time of purchasing the Subject Vehicle, Mr. Ratcliffe did not believe that the Subject Vehicle would abruptly roll over during a turn or that his arm would instinctually or reflexively extend out the open window during a rollover.[11]  PSAMF

---

[9]      BRP denies PSAMF ¶ 61, which relies solely on Mr. Ratcliffe's affidavit, on the ground that the affidavit "is improper and should be struck from the record because it misstates the factual record and was drafted after BRP moved for summary judgment."  DRPSAMF ¶ 61.  In accordance with the Court's later discussion of post-summary judgment affidavits, the Court rejects BRP's denial, as BRP has not shown that Mr. Ratcliffe's affidavit contradicts his prior testimony.

[10]      BRP denies PSAMF ¶ 62, which relies solely on Mr. Ratcliffe's affidavit, for the same reasons described in the previous footnote.  DRPSAMF ¶ 62.  The Court rejects BRP's denial for the reason described in the previous footnote.

[11]      BRP denies PSAMF ¶ 63 because it relies solely on Mr. Ratcliffe's affidavit, which BRP contends "is improper and should be struck from the record because it misstates the factual record and was drafted after BRP moved for summary judgment."  DRPSAMF ¶ 63.  In accordance with the Court's later discussion of post-summary judgment affidavits, the Court rejects BRP's denial, as BRP has not shown that Mr. Ratcliffe's affidavit contradicts his prior testimony.

¶ 63; DRPSAMF ¶ 63.  Mr. Ratcliffe was never warned by BRP or Tidd's that an operator's or occupant's arm might instinctually or reflexively extend outside of the window area in a rollover.[12, 13]  PSAMF ¶ 64; DRPSAMF ¶ 64.  Had Mr. Ratcliffe received such a warning, he would not have operated the Subject Vehicle without window nets or wrist restraints.[14]  PSAMF ¶ 66; DRPSAMF ¶ 66.

### D.    The July 30, 2019 Accident

Upon purchasing the Subject Vehicle, Mr. Ratcliffe hauled it about ten miles to his family's campsite in Houlton, Maine.  DSMF ¶ 23; PRDSMF ¶ 23.  Upon arriving at the camp, Mr. Ratcliffe testified that his focus was on "getting out on the trails as much as possible."  DSMF ¶ 24; PRDSMF ¶ 24.

---

[12]    BRP denies PSAMF ¶ 64, again basing its denial in part on Mr. Ratcliffe's reliance on his affidavit.  DRPSAMF ¶ 64.  The Court rejects BRP's denial insofar as it rests on Mr. Ratcliffe's affidavit for the reasons described in the previous footnote.

Additionally, BRP "contends that it provided ample warnings to Plaintiff concerning the need to keep an operator's or occupants' arms inside the vehicle."  *Id.*  The Court rejects this basis for BRP's denial as beyond the scope of the fact asserted.

[13]    PSAMF ¶ 65 reads: "The lack of window nets, in combination with the vehicle's propensity to roll over and Mr. Ratcliffe's human instinct or reflex to extend his arm to brace the fall during a rollover, rendered the Subject Vehicle's condition dangerous in a manner that Mr. Ratcliffe never contemplated prior to this incident."

BRP denies PSAMF ¶ 65 for two reasons.  First, BRP takes issue with Mr. Ratcliffe's reliance on his affidavit, which BRP contends "is improper and should be struck from the record because it misstates the factual record and was drafted after BRP moved for summary judgment."  DRPSAMF ¶ 65.  Further, BRP argues that PSAMF ¶ 65 "is an improper conclusion of law unsupported by the factual record and cannot be presented as fact in an affidavit or statement of material fact in support of a motion for summary judgment."  *Id.*

The Court agrees with BRP that PSAMF ¶ 65 contains an improper conclusion of law.  Accordingly, the Court does not include PSAMF ¶ 65.

[14]    BRP denies PSAMF ¶ 66 because it relies solely on Mr. Ratcliffe's affidavit, which BRP contends "is improper and should be struck from the record because it misstates the factual record and was drafted after BRP moved for summary judgment."  DRPSAMF ¶ 66.  Further, BRP reiterates its belief that "it provided ample warnings to Plaintiff concerning the need to keep an operator's or occupants' arms inside the vehicle."  *Id.*

The Court rejects BRP's denial insofar as it is grounded in Mr. Ratcliffe's reliance on his affidavit because BRP has not shown that Mr. Ratcliffe's affidavit contradicts his prior testimony.  Further, BRP's assertion that it provided ample warnings to Mr. Ratcliffe is beyond the scope of the fact asserted, and the Court rejects BRP's denial insofar as it rests on this basis.

The accident at issue occurred on July 30, 2019, at approximately 5:56 p.m., in Houlton, Maine.  JSMF ¶ 5; DSMF ¶ 5; PRDSMF ¶ 5.  Mr. Ratcliffe had been operating the Subject Vehicle on trails around the campsite for a "couple hours" or so before his accident.  DSMF ¶ 25; PRDSMF ¶ 25.  Mr. Ratcliffe performed "donuts" with the Subject Vehicle after purchasing it, but he was not doing donuts in the moments leading up to the accident.  DSMF ¶ 26; PRDSMF ¶ 26.

The accident occurred in an area known as Gogan's gravel pit.  DSMF ¶ 27; PRDSMF ¶ 27.  Mr. Ratcliffe testified regarding the accident sequence:

> So my actions in that gravel pit consisted of really just going back and forth in the gravel pit and using that area as the turnaround.  That area to turn around is not so wide where you could maintain a very high velocity, but the motion would be entering – if you're looking at that cul-de-sac area and you think you're entering, say, at 6 o'clock, you would also exit at 6 o'clock, right, or 4:00 o'clock because you kind of enter at 7:00, 6:00, 5:00 and 4:00 in that area.  And as I came around – as I came around full motion in exiting and then going to turn back into the area where I was going back and forth, that's where the vehicle rolls.  And I had already done that three, four, five times.

DSMF ¶ 28; PRDSMF ¶ 28.  Mr. Ratcliffe described the terrain where the accident occurred as "flat."  DSMF ¶ 29; PRDSMF ¶ 29.  When Mr. Ratcliffe was turning to the right immediately before the vehicle tipped over (a quarter roll onto its driver's side), he had both hands on the steering wheel.  DSMF ¶ 30; PRDSMF ¶ 30; PSAMF ¶ 69; DRPSAMF ¶ 69.  At the time of the accident, Mr. Ratcliffe was wearing a helmet with a full face shield, riding gloves, and a seat belt.  PSAMF ¶¶ 67-68; DRPSAMF ¶¶ 67-68.

Mr. Ratcliffe testified that, during the accident sequence, the Subject Vehicle did not "flip completely" but instead "rolled over onto its [driver's] side and probably

up a little bit from the inertia.  DSMF ¶ 31; PRDSMF ¶ 31.  According to Mr. Ratcliffe, the turn maneuver preceding the accident was "just a normal radius turn," and he was going "no more than probably 20 miles an hour."  DSMF ¶ 32; PRDSMF ¶ 32. Mr. Ratcliffe's expert described the accident sequence as "slow" and "low energy," resulting in a 90-degree, driver's-side-leaning tip-over.  DSMF ¶ 33; PRDSMF ¶ 33. At the time of the rollover, Mr. Ratcliffe was making what he described as an "ordinary" turn.[15]  PSAMF ¶ 70; DRPSAMF ¶ 70.

The parties attached to the Joint Stipulated Record three copies of reports concerning the July 30, 2019 accident: the state of Maine Crash Report as Exhibit 11, JSMF ¶ 6; the Maine Warden Service's Incident Report as Exhibit 12, JSMF ¶ 7; and the Houlton Police Department's Incident Report as Exhibit 13.  JSMF ¶ 8.  The Maine Warden Service Incident Report notes:

> Ratcliffe was circling in a gravel pit near the ATV trail in Houlton when the vehicle rolled over on the driver's side.  Ratcliffe attempted [to] brace the rollover with his left arm.  Ratcliffe's left arm was nearly severed off by the ATV's roll bar.

PSAMF ¶ 71; DRPSAMF ¶ 71.

---

[15]    PSAMF ¶ 70 reads: "At the time of the rollover, Plaintiff was making an ordinary turn."  BRP interposed a qualified response to PSAMF ¶ 70.  DRPSAMF ¶ 70.  BRP admitted "that Plaintiff described the turn maneuver preceding the tipover as just a normal radius turn and testified that he was going no more than probably 20 miles an hour."  *Id.* (internal quotations omitted).  BRP counters, however, that it "does not endeavor to assign its own description to the turn for purposes of its Motion." *Id.*

Rather than engage in the parties' dispute about whether Mr. Ratcliffe's turn can properly be characterized as normal, the Court amended PSAMF ¶ 70 to indicate that it reflects Mr. Ratcliffe's description.

During the accident, Mr. Ratcliffe extended his left arm outside of the window area instinctually, reflexively, and without volition.[16]  PSAMF ¶ 72; DRPSAMF ¶ 72.  Mr. Ratcliffe alleges that he suffered an injury to his left arm as a result of the accident.  DSMF ¶ 7; PRDSMF ¶ 7.  Mr. Ratcliffe's expert, Dr. Nobilini, opines that "Plaintiff's injuries were consistent with his left forearm being crushed between the driver's side rail of the [rollover protective structure] and the ground during the subject rollover event."  DSMF ¶ 8; PRDSMF ¶ 8.

### E.   BRP's Warnings Regarding the Maverick X3

The Subject Vehicle was sold with an operator's guide, a copy of which was attached to the Joint Stipulated Record as Exhibit 10.  JSMF ¶¶ 6, 10; DSMF ¶ 6; PRDSMF ¶ 6.  Page 11 of the Operator's Guide includes the following excerpt:

> This is a high performance off-road vehicle.  Operators must be responsible and use care to avoid rollovers, tipovers, collisions, and other accidents.  Even with vehicle safety features (such as protective structure, seat belts, doors) and protective gear (such as a helmet), there is always a risk of injury or death in these accidents.  To reduce the risk of serious injury or death, follow the rules in this section.[17]

DSMF ¶ 34; PRDSMF ¶ 34.

---

[16]  BRP interposed a qualified response to PSAMF ¶ 72.  DRPSAMF ¶ 72.  BRP admits "that Plaintiff described his arm movement during the crash as instinctual," but it "objects to Plaintiff's reliance on the improper affidavit filed in conjunction with Plaintiff's Opposition to Summary Judgment."  *Id.*  BRP contends that Mr. Ratcliffe's affidavit "is improper and should be struck from the record because it misstates the factual record and was drafted after BRP moved for summary judgment."  *Id.*

In accordance with the Court's later discussion of post-summary judgment affidavits, the Court rejects BRP's denial, as BRP has not shown that Mr. Ratcliffe's affidavit contradicts his prior testimony.

[17]  In its statement of material facts, BRP included images of this warning, and the other warnings reproduced in this order, as they appear in real life.  *See, e.g.*, DSMF ¶ 34.  While the Court appreciates BRP's efforts to convey how the warnings would appear to a user of the Subject Vehicle, the Court reproduces only the text of the warnings in this order to facilitate readability. Furthermore, BRP has not suggested there is anything about the reproduced warnings—as opposed to the language in the warnings—that affects the resolution of this motion.

Page 13 of the Operator's Guide includes the following excerpt:

Never assume that the vehicle will go everywhere safely. Sudden changes in terrain caused by holes, depressions, banks, softer or harder "ground" or other irregularities may cause the vehicle to topple or become unstable. To avoid this, slow down and always observe the terrain ahead. If the vehicle does begin to topple or rollover, the best advice is to immediately steer in the direction of the rollover! Never attempt to prevent a rollover with your arms or legs. You should keep your limbs inside the cage.

DSMF ¶ 35; PRDSMF ¶ 35.

Pages 19 and 20 of the Operator's Guide read as follows:

## AVOID ACCIDENTS

### Avoid Rollovers and Tipovers

Side-by-side vehicles handle differently from other vehicles. Side-by-side vehicles are designed to handle off-road terrain (for example, their wheel base and track width, ground clearance, suspension, drivetrain, tires, etc.) and, as a result, can overturn in situations where vehicles designed for use primarily on paved or smooth terrain may not.

A rollover or other accident can occur quickly during abrupt maneuvers such as sharp turns or hard acceleration or deceleration when turning, or when driving on hills or over obstacles. Abrupt maneuvers or aggressive driving can cause rollovers or loss of control even in flat open areas. If the vehicle rolls over, any part of your body (such as arms, legs, or head) outside of the cockpit can be crushed and trapped by the cage or other parts of the vehicle. You can also be injured by impact with the ground, cockpit or other objects.

To reduce the risk of rollovers:
  – Use care when turning.
    • Do not turn the steering wheel too far or too fast for your speed and environment. Adjust steering inputs according to your speed and environment.
    • Slow down before entering a turn. Avoid hard braking during a turn.
    • Avoid sudden or hard acceleration when turning, even from a stop or low speed.

- Never attempt donuts, skids, slides, fishtails, jumps, or other stunts. If [the] vehicle starts to skid or slide, steer in the direction of the skid or slide. Never slam the brakes and lock the wheels.
- Avoid paved surfaces. This vehicle is not designed to operate on paved surfaces and is more likely to roll over. If you must drive on pavement, turn gradually, go slowly, and avoid abrupt acceleration and braking.

This vehicle can roll over sideways or tip over forward or backwards on slopes or uneven terrain.
- Avoid side hilling (driving along the slope rather than up or down a hill). When possible, drive straight up and down inclines rather than across them. If you must side hill, use extreme caution and avoid slippery surfaces, objects, or depressions. If you feel the vehicle start to rollover or slide sideways, steer downhill if possible.
- Avoid steep hills and follow procedures in this guide for climbing and descending hills.
- Sudden changes in terrain such as holes, depressions, banks, softer or harder ground or other irregularities may cause the vehicle to tip or become unstable. Observe the terrain ahead and slow down in areas of uneven terrain.

This vehicle will handle differently when carrying or pulling a load.
- Reduce speed and follow instructions in this manual for carrying cargo or pulling a trailer.
- Avoid hills and rough terrain.
- Allow more distance to stop.

Be Prepared in Case of Rollover
- Close both doors and fasten seat belt to help you avoid sticking out arms or legs.
- Never grab the cage while riding. Hands can be crushed between the cage and the ground in a rollover. Keep hands on the steering wheel or handholds.
- Never try to stop a rollover using your arms or legs. If you think that the vehicle may tip or roll, the driver should keep both hands on the steering wheel and the left foot firmly planted on the footrest. The passenger should keep both hands on the handholds and both feet firmly planted on the floor.

**Avoid Collisions**

21

This vehicle can reach high speeds.  At higher speeds, there is an increased risk of losing control, particularly in challenging off-road conditions, and the risk of injury in a collision is greater.  Never operate at excessive speeds.  Always go at a speed that is proper for the terrain, visibility, and operating conditions, and your experience.  Consider reserving use of the performance key for situations in which full speed and acceleration capability are appropriate.

Never operate this vehicle on any public street, road or highway, even dirt or gravel ones.  Riding your vehicle on roads or highways could result in a collision with another vehicle.  This vehicle is not designed for operation on roads.  For example, it does not meet motor vehicle safety standards that apply to automobiles.  In many jurisdictions it is not legal to operate this vehicle on public roads.

This vehicle does not have the same kind of protection for collisions as a car; for example, there are no air bags, the cockpit is not fully enclosed, and it is not designed for collisions with other vehicles.  Therefore, it is particularly important to fasten seat belts and close doors and wear an appropriate helmet.

DSMF ¶¶ 36-37; PRDSMF ¶¶ 36-37.

One side of the "hang tag" provided by BRP for the Subject Vehicle, as reproduced on Page 30 of the Operator's Guide, reads as follows:

**WARNING**

**THIS VEHICLE IS INTENDED FOR RECREATIONAL USE AND SECONDARY GENERAL UTILITY APPLICATIONS NO OPERATOR UNDER AGE 16**

**TRAINING COURSES TO TEACH ROV DRIVING ARE AVAILABLE.  FOR INFORMATION CONTACT YOUR LOCAL DEALER.**

**Read the Operator's Guide and Safety Labels and Watch the Safety Video.**
**Follow All Instructions and Warnings.**

**CHECK WITH YOUR DEALER TO FIND OUT ABOUT STATE OR LOCAL LAWS REGARDING ROV OPERATION.**

22

Improper Use of Off-Highway Vehicles Can Cause Severe Injury or Death

Be Prepared
- Fasten seat belts and make sure nets or doors are securely latched in place.
- Wear an approved helmet and protective gear.
- Each rider must be able to sit with back against seat, foot flat on the floor or on footrest, and hands on steering wheel or handholds. Stay completely inside the vehicle.

Drive Responsibly
Avoid loss of control and rollovers:
- Avoid abrupt maneuvers, sideways sliding, skidding or fishtailing, and never do donuts.
- Avoid hard acceleration when turning, even from a stop.
- Slow down before entering a turn.
- Plan for hills, rough terrain, ruts, and other changes in traction and terrain. Avoid paved surfaces.
- Avoid side hilling (riding across slopes).

Rollovers have caused severe injuries and death, even on flat, open areas.

Be Sure Riders Pay Attention and Plan Ahead
If you think or feel the vehicle may tip or roll, reduce your risk of injury:
- Keep a firm grip on the steering wheel or handholds and brace yourself.
- Do not put any part of your body outside of the vehicle for any reason.

Require Proper Use of Your Vehicle
- Do your part to prevent injuries:
  - Do not allow careless or reckless driving.
  - Make sure operators are 16 or older with a valid driver's license.
  - Do not let people drive after using alcohol or drugs.
  - Do not allow operation on public roads (unless designed for off-highway vehicle access) – collisions with cars and trucks can occur.
  - Do not exceed seating capacity: see information on backside of this card.

**THIS HANG TAG CAN'T BE REMOVED BEFORE SALE.**

DSMF ¶ 38; PRDSMF ¶ 38.

The Subject Vehicle contained an on-product decal, placed in the upper left corner of the dashboard on the driver's side, which read:

**WARNING**

Improper Use of Off-Highway Vehicles Can Cause Severe Injury or Death

Be Sure Riders Pay Attention and Plan Ahead

If you think or feel the vehicle may tip or roll, reduce your risk of injury:
- Keep a firm grip on the steering wheel or handholds and brace yourself.
- Do not put any part of your body outside of the vehicle for any reason.

Be Prepared
- Fasten seat belts and close doors.
- Wear an approved helmet and protective gear.
- Each rider must be able to sit with back against seat, foot flat on floor or on footrest, and hands on steering wheel or handholds. Stay completely inside the vehicle.

Drive Responsibly
Avoid loss of control and rollovers:
- Avoid abrupt maneuvers, sideways sliding, skidding or fishtailing, and never do donuts.
- Slow down before entering a turn.
- Avoid hard acceleration when turning, even from a stop.
- Plan for hills, rough terrain, ruts, and other changes in traction and terrain. Avoid paved surfaces.
- Avoid side hilling (riding across slopes).

Rollovers have caused severe injuries and death, even on flat, open areas.

DSMF ¶ 39; PRDSMF ¶ 39.

Another on-product decal, placed to the upper left of the driver's side A-pillar on the Subject Vehicle, read as follows:

**WARNING**

Improper Use of Off-Highway Vehicles Can Cause Severe Injury or Death
Be prepared in case of rollover.
NEVER
- Hold the cage while riding.
- Try to stop a rollover using your arm or leg.
ALWAYS
- Fasten seat belts and close doors.

Require Proper Use of Your Vehicle
Do your part to prevent injuries:
- Do not allow careless or reckless driving.
- Make sure operators are 16 or older with a valid driver's license.
- Do not let people drive or ride after using alcohol or drugs.
- Do not allow operation on public roads (unless designated for off-highway vehicle access) – collisions with cars and trucks can occur.
- Do not exceed seating capacity: 2 occupants.

Read and understand all safety labels, locate and read operator's guide. Watch the safety video using the QR code link or visit Can-am web site before operation.

DSMF ¶ 40; PRDSMF ¶ 40.

During Mr. Ratcliffe's deposition, the following exchange occurred:

Q: Do you remember having a safety instruction that said: In the case of rollovers, never grab the cage?
. . .
A: I would say that there's written instruction that say that. I'm sure in your manual, I'm sure on the vehicle itself. When -- when your body is falling, right, it's almost an involuntary reaction for you to want to brace yourself, right? And you know, someone could instruct me a thousand times over, and I think, knowing my body and my reflexes, I would instinctually want to brace myself from falling when I feel my body falling.

> Q: So do you remember reading or being instructed that if you think the vehicle may tip or roll, the driver should keep both hands on the steering wheel and the left foot planted on the footrest?
>
> A: I'll go back to my last answer to answer that, right? Sure, I may have read that, but it's -- you're talking about a conscious decision versus an involuntary, you know, reaction.

DSMF ¶¶ 42-43; PRDSMF ¶¶ 42-43.

## F.     BRP's Marketing of the Maverick X3

During his deposition, Marc Lacroix, a marketing executive at BRP, testified that in the 2018-2020 timeframe BRP posted videos on BRP's Can-Am Off-Road Facebook channel. PSAMF ¶ 51; DRPSAMF ¶ 51. In particular, Mr. Lacroix offered the following testimony:

> Q: But specifically with regard to how people were operating side-by-sides, why was Can-Am Off-Road posting that content?
>
> A: In general, videos are very popular and appreciated by fan base. Obviously, a picture is worth a thousand words, but a video is even more, how would I say it, exciting for people to watch.
>
> Q: So, it wanted people to watch how other consumers were using Can-Am products; is that correct?
>
>> MR. MONSON: Objection.
>>
>> THE WITNESS: What do you mean by other consumers?
>>
>> MR. MEGA: People other than those within the video that Can-Am was posting.
>
> A: We would showcase videos, Can-Am vehicles being operated.
>
> Q: To generate interest?
>
> A: To generate awareness first and foremost, and, yes, interest, and to win their hearts and minds.
>
> Q: To show other people how consumers of Can-Am side-by-sides were using Can-Am vehicles, right?
>
> . . .
>
> A: We showcased videos that showed the vehicles being used.

PSAMF ¶ 52; DRPSAMF ¶ 52.

On June 7, 2019, BRP posted a video to the Can-Am Off-Road Facebook channel showing operators of Can-Am side-by-sides, including Maverick X3s,

performing donut maneuvers.  PSAMF ¶ 53; DRPSAMF ¶ 53.  BRP did not include

any disclaimers (such as professional driver, closed course, or don't try this yourself)

in this video.  PSAMF ¶ 53; DRPSAMF ¶ 53.  The caption for the video read: "Here's

your 1/2 dozen fresh outta the oven for National Donut Day."   PSAMF ¶ 53;

DRPSAMF ¶ 53.

      Mr. Ratcliffe's counsel showed BRP's June 7, 2019 video post to Mr. Lacroix,

who testified, "I believe it is likely that a BRP employee created this post."  PSAMF

¶ 54.; DRPSAMF ¶ 54.  Mr. Lacroix further testified:

> Q: Did you see a disclaimer on that video?
> A: I did not notice a disclaimer on this specific video.
> Q: Do you believe that video is glorifying doughnuts?
> A: I believe this video is generating excitement, and it is using National
> Doughnut Day as an opportunity to create excitement for doughnuts.

PSAMF ¶ 54; DRPSAMF ¶ 54.

      On June 5, 2020, BRP posted a video featuring two operators of Maverick X3s

performing donut maneuvers.  PSAMF ¶ 55; DRPSAMF ¶ 55.  BRP did not include

any disclaimers in this video.  PSAMF ¶ 55; DRPSAMF ¶ 55.  Mr. Ratcliffe's counsel

showed the June 5, 2020 video to Mr. Lacroix, who offered the following testimony:

> Q: Does that depict two separate vehicles performing doughnuts at the
> same time?
> A: Yes, I do see two vehicles performing doughnuts in this video.
> . . .
> Q: Okay.  Why would someone from BRP post that on June 5, 2020 on
> social media?
> . . .
> A: As to why, I don't know.  I believe they were doing a post in line with
> National Doughnut Day to generate excitement for the Can-Am brand.
> Q: Is there any disclaimer on that video that someone watching it
> shouldn't try to perform those types of maneuvers, or they were contrary
> to the operator's manual?
> A: I did not see a specific disclaimer in this video shown.

> Q: Or a warning, right?
> A: I did not see a warning in this specific video shown.

PSAMF ¶ 56; DRPSAMF ¶ 56.

On June 4, 2021, BRP posted another video celebrating "National Donut Day," featuring an operator of a Maverick X3 performing donut maneuvers.  PSAMF ¶ 57; DRPSAMF ¶ 57.  BRP did not include any disclaimers in this video.  PSAMF ¶ 57; DRPSAMF ¶ 57.  The caption for the video read, in part: "Happy National Doughnut Day! Here's our friend Ostacruiser spinnin' up some dirt.  We want YOU to celebrate with us."  PSAMF ¶ 57; DRPSAMF ¶ 57.

Mr. Ratcliffe's counsel showed BRP's June 4, 2021 video to Mr. Lacroix, who offered the following testimony:

> Q: Were there any warnings or disclaimers on that video that third parties shouldn't perform doughnuts or operate a Can-Am side-by-side like that person did?
> A: I did not see any specific warnings or disclaimers on this specific video.
> . . .
> Q: Is there a warning or disclaimer typed in, into the language that falls directly below the June 4, 2021, "Doughnuts on us," typewritten words?
> A: I do not see any specific disclaimers in this text as shown here.
> . . .
> Q: So getting back to my question, as opposed to just reading the language there: Does that encourage in your mind users of Can-Am side-by-sides to perform doughnuts themselves and to take video of those doughnuts?
> . . .
> A: I don't believe it encourages people to perform doughnuts.  I believe it invites people to share doughnut videos.
> . . .
> Q: Well, to share a doughnut video, you have to have done a doughnut or videotaped a friend doing a doughnut, right?
> . . .
> A: I don't agree with that statement.  It could be a video that they found on the Internet that they share.  I don't believe it explicitly invites them to perform doughnuts.

28

PSAMF ¶ 58; DRPSAMF ¶ 58.

### G.   The Conclusions of Stephen J. Ratcliffe's Experts

Dr. Nobilini, a mechanical and biomedical engineer, offered the following

summary of his opinions related to the design defects of the Maverick X3:

> The following opinions, in addition to those expressed elsewhere in this report, are based upon my education, training, and experience as well as my examination and analysis of the evidence and are stated to a reasonable degree of engineering certainty:
>
> - BRP was aware that a rollover was a foreseeable hazard of the subject vehicle.
> - Extending one's arm in the direction that they are falling is a natural protective response.
> - It was foreseeable that occupants would instinctively extend their arm outside the roll cage during a lateral rollover.
> - BRP knew that occupants would instinctively extend their arms outside of the roll cage during a lateral rollover.
> - The movement of Mr. Ratcliffe's left arm in the direction that he was falling (i.e. towards the ground and outside of the roll cage) was consistent with an instinctive natural protective response.
> - The warnings on the subject Can-Am Maverick X3 were not an effective measure to prevent the natural instinctive response to extend one's arm as they fell towards the ground during a lateral rollover.
> - Mr. Ratcliffe's injuries were consistent with his left forearm being crushed between the driver's side rail of the [rollover protection system] and the ground during the subject rollover event.
> - The lack of dust and scratches in the middle of the left rail of the roll cage was consistent with Mr. Ratcliffe's left arm pinned between this portion of the roll cage and the ground.
> - BRP knew or should have known that if an occupant's arm moved outside the roll cage during a lateral rollover, their arm could be crushed by the roll cage or the frame of the vehicle.
> - The opening between the top of the door and the lateral rail of the roll cage allowed for an occupant's arm to move outside the roll cage and into harm's way.
> - The lack of an adequate restraint system to prevent an occupant's arm from moving outside the roll cage during a lateral rollover made the subject vehicle unreasonably dangerous for its intended use.

- The subject Can-Am Maverick X3 vehicle was designed and sold in a defective condition and unreasonably dangerous to users including Mr. Ratcliffe.
- The defective design of the subject vehicle was a substantial contributing factor to Mr. Ratcliffe's injuries.

PSAMF ¶ 73; DRPSAMF ¶ 73; *see also* DSMF ¶¶ 44-45; PRDSMF ¶ 44-45.

Dr. Batzer, a mechanical engineer, offered this summary of his opinions related

to the design defects of the Maverick X3:

Enumerated case opinions, in addition to opinions expressed elsewhere within this report, are set forth below. This list is intended to summarize my analysis of the design of the 2019 Can-Am Maverick X3 and the details of this case.

1. This vehicle was involved in a driver's side leading rollover collision of approximately one quarter revolution. This overturn occurred as Mr. Ratcliffe was circling within a gravel pit. This is a foreseeable and promoted use of the vehicle.

2. The rollover was rather slow and resulted in cosmetic damage to the vehicle and a life-altering injury to Mr. Ratcliffe. This was a minor accident with serious consequences. Note that if this had been a fast rollover, there would be more rotational inertia present and the vehicle would have continued with more roll quarters than were observed to occur.

3. Rollover accidents are low energy transfer rate collisions, unlike frontal, side, and rear collisions. They are typically highly survivable and will result in minimal or no injuries if the vehicle has effective rollover protection and the occupant is not partially or fully ejected.

4. The subject vehicle was designed and marketed for "spirited driving." This term includes jumps, stunts, slide outs, and doughnuts. These activities are what the vehicle was made for and marketed for. Numerous promotional internet postings and videos [e.g., *National Doughnut Day!*] by BRP/Can-Am promote spirited driving by the purchasers and users of Can-Am vehicles. Spirited driving produces adrenaline in the target market.

5. The Can-Am Maverick X3 recreational off-highway vehicle, as designed and as sold, was in a defective condition and

unreasonably dangerous to the user in rollover incidents because it subjects the occupants to hazards which should be effectively guarded against. The two major defects are the lack of full portal covering window netting and the design of the roll cage (ROPS) in which the side-rails are not recessed toward the centerline of the vehicle, similar to the vehicles shown above as exemplars. The implementation of window netting and/or a different ROPS design likely would have prevented Stephen Ratcliffe's injury.

6. There were no technological or economic barriers preventing BRP Inc. from designing, manufacturing and equipping the subject vehicle with factory standard side safety netting and recessed cage fore-aft rails sufficient to the job of protecting occupant arms and heads during foreseeable rollovers.

7. The manufacture of a Can-Am Maverick X3 with full coverage nets and a ROPS with recessed side rails would not have diminished the utility of the vehicle, but rather would have improved its functionality. These additions would increase the rollover collision crashworthiness without diminishing performance or consequentially increasing weight or cost and would have prevented the injuries incurred.

8. Tidd's erroneously informed Mr. Ratcliffe that, "You're low to the ground . . . low center of gravity . . . it would take a bunch, I mean, you'd have to get really nuts with it," for the X3 to roll over. These statements were inappropriate and factually incorrect.

9. In order to validate the safety of a system, realistic destructive physical testing is required. The ROHVA testing produced in discovery tests the reaction of anthropomorphic test devices (ATDs) to quasi-static, or unrealistically slow changes in vehicle orientation. That is, tilt table tests and hill rollovers without forward velocity. This is unsatisfactory and represents an omission, as Can-Am cannot rely upon any knowledge of window net efficiency that is derived from unrealistic testing. Despite substantial durability and handling testing, Can-Am did not credibly test their Maverick X3 for rollover safety with a destructive dynamic rollover. Further, they have field experience of unplanned rollovers which act as "natural tests" of recreational highway vehicles. These unplanned incidents show that UTV occupants in overturns extend their hands and arms to protect themselves. Yet, this hazard is not adequately addressed technologically, as it is in racing contexts.

31

PSAMF ¶ 74; DRPSAMF ¶ 74.  Dr. Batzer also stated:

> When a person attempts to break his or her fall by interposing his arm
> between his head and the impact surface, the reflexive action is to
> diminish injury, not to enhance injury.  Without training, a person will
> typically not volitionally allow himself to be injured.  When occupants,
> such as Stephen Ratcliffe, place their arm outside of the occupant
> compartment, it is in an attempt to diminish injury, not ensure it.  Such
> a reflex is not effectively overcome by a passive warning during the high-
> pressure situation of a roll-over.

PSAMF ¶ 75; DRPSAMF ¶ 75.

Mr. Ratcliffe's human factors expert, Dr. David Lenorovitz, offered the

following opinion:

### 6.3.1 UTV Driver/Rider Instinctive/Reactive Limb/Hand Movements vs Purposeful/Intentional/Volition-Based Movements

From an ergonomics or HFE perspective certain body part movements
can be distinguished as either being initiated with purposeful intent or
volition, or as being reactionary/instinctive/or even highly over-earned
(almost automatically executed) movements (Karnes, Lenorovitz, &
Leonard, 2010).  When a driver is belted inside a vehicle that is in the
process of suddenly rolling over or flipping on its side his world is in the
process of literally "being turned upside down," and he is likely to be
reaching out instinctively to brace himself.  This is a very basic human
reflexive reaction, akin to reaching out with your hands during an
unexpected forward fall.  You don't pause and reflect and think about
what to do in such a situation ~ you just naturally react and flat out do
it.  Telling someone where to "Keep" your hands, or where not to "Put"
your limbs or other body parts (see Warning Labels 1 & 3 in the
Operator's Guide) does no good when that someone is in the middle of
such an event scenario.  Your hand/arm is simply going to do what it's
naturally going to do.

The best you can do when designing or engineering an equipment
system in which such reactionary limb movements are likely -- and,
again, BRP representatives repeatedly stated that they knew that such
rollover incidents can and do occur -- is to incorporate some type of
guard, shield, or restraint mechanism to preclude the limb (hand/arm)
from accidentally/involuntarily moving into harm's way.  The NASCAR-
like window net that Mr. Ratcliffe had requested is (should be) intended

to provide just such an economical ($46) but effective type of protection. Another racecar-inspired economical ($17) solution is a simple wristband restraint that attaches to the driver's left wrist and to his seat belt (see Figure 12). Had BRP provided either of these devices as standard equipment safety measures (i.e., not as after-market, extra-cost accessory items), it is likely that Mr. Ratcliffe would not have sustained the costly injury that he did.

PSAMF ¶ 100; DRPSAMF ¶ 100. Dr. Lenorovitz, also offered the opinion that Mr. Ratcliffe did not "sufficiently underst[and]" the risks attendant with the use of the Subject Vehicle. DSMF ¶ 41; PRDSMF ¶ 41.

## III.   THE PARTIES' POSITIONS

### A.   BRP U.S. Inc.'s Motion for Summary Judgment

In its memorandum of law, BRP observes that Mr. Ratcliffe's negligence and strict liability claims both "hinge on the same two theories of liability: (i) that the Subject Vehicle was defective in design due to the lack of netting over the driver's side window; and (ii) that the warnings provided by BRP were inadequate to make Plaintiff aware of the risk of crush injuries to occupants' upper extremities in the event of a rollover." *BRP's Mem. of Law.* at 12.

BRP argues it is entitled to summary judgment because "Plaintiff lacks evidence that the claimed injury to his left arm was caused by a defect in the vehicle's design or warnings." *Id.* at 2. Regarding Mr. Ratcliffe's design defect theory, BRP maintains that such a claim "is actionable 'only if the product left the seller's hands in a condition not contemplated by the ultimate consumer.'" *Id.* (quoting *Burns v. Architectural Doors & Windows*, 2011 ME 61, ¶ 19, 19 A.3d 823, 828). Here, BRP posits that "the undisputed evidence shows the Maverick was precisely what Plaintiff

contemplated when he purchased it: a high-powered recreational off-highway vehicle that did not come equipped with window nets." *Id.*

With respect to Mr. Ratcliffe's failure-to-warn theory, BRP points out that Mr. Ratcliffe testified he instinctively tried to brace himself when he felt the Subject Vehicle tip and also "designated an expert to offer the opinion that an occupant will instinctively extend their arm outside the roll cage during a lateral tipover as a natural protective response." *Id.* at 3 (internal quotations omitted). "Taking Plaintiff and his expert at their word," BRP continues, "the inescapable conclusion is that any supposed inadequacy in BRP's warnings did not play any role in Plaintiff placing his arm outside the vehicle—or, in legalese, Plaintiff cannot meet his *prima facie* burden to prove that a warnings defect caused his accident." *Id.*

BRP spends the remainder of its memorandum of law developing these two arguments. Beginning with the design defect theory, BRP argues that "it remains a plaintiff's burden to prove that the product at issue was defective and its defective condition was the proximate and legal cause of the complained-of harm." *Id.* at 12. Notwithstanding the other elements of a design defect claim, BRP insists that "an injured person can prevail in such a design defect claim only if the product left the seller's hands 'in a condition not contemplated by the ultimate consumer.'" *Id.* at 12-13 (quoting *Burns*, 2011 ME 61, ¶ 19, 19 A.3d at 828).

According to BRP, *Burns* forecloses Mr. Ratcliffe's design defect theory because "the Subject Vehicle is precisely what Plaintiff contemplated it was when he saw it on the lot of Tidd's dealership." *Id.* at 13. In support, BRP maintains that "[t]he

34

record evidence demonstrates that, at the time he purchased the Subject Vehicle, [Mr. Ratcliffe] was aware of the availability of window nets; that the 2019 Maverick did not come with nets as standard equipment; that he considered nets to be [a] desirable feature; that other UTVs could be purchased with nets; and that aftermarket nets were available for the Subject Vehicle." *Id.* Therefore, BRP argues, Mr. Ratcliffe "cannot now be heard to complain that the vehicle is defective for lacking an element he considered and decided was not necessary for safe operation." *Id.*

Turning to Mr. Ratcliffe's failure-to-warn theory, BRP reiterates that "Plaintiff lacks evidence that an inadequacy in BRP's warnings caused his injuries because no warning would have prevented his involuntary, instinctual arm movement." *Id.* (internal quotations omitted) (capitalization altered). In BRP's view, to prove causation, the third element of a failure-to-warn claim, Mr. Ratcliffe "must show that, had a different, allegedly adequate warning been given, the plaintiff would not have been injured." *Id.* at 14 (citing *Koken v. Black & Veatch Constr., Inc.*, 426 F.3d 39, 49 (1st Cir. 2005)).

BRP avers that Mr. Ratcliffe cannot demonstrate causation here because he "cannot show that, had BRP provided another or a different warning regarding the inherent risk of rollovers and the need for occupants to keep their arms and legs inside the vehicle, his injury would have been prevented." *Id.* This is so, BRP continues, because Mr. Ratcliffe's "deposition testimony—buttressed by his expert's opinion—reflects his belief that his arm exited the Subject Vehicle as a reflexive,

instinctual response to the low-speed tip-over." *Id.* As such, BRP concludes, Mr. Ratcliffe's "warning-based . . . claims must fail." *Id.*

### B. Stephen J. Ratcliffe's Opposition

In his memorandum of law, Mr. Ratcliffe responds that "there is ample *prima facie* evidence that a design defect (or defects) proximately caused this accident, and *prima facie* evidence that inadequate warnings also proximately caused this accident." *Pl.'s Mem. of Law* at 1.

Beginning with his design defect theory, Mr. Ratcliffe asserts that "there is evidence that this incident was caused by a design defect in the Subject Vehicle, which was unknown to the Plaintiff, and of which he was not warned." *Id.* at 8 (capitalization altered). Mr. Ratcliffe initially posits that "BRP focuses exclusively on window nets, but Plaintiff's experts also offer opinions that the vehicle was unreasonably dangerous because of the design of its roll cage and its lack of wrist restraints." *Id.* at 5.

Mr. Ratcliffe accepts that he has the burden of establishing "that the product was defectively designed," which "involves an examination of the utility of the product's design, the risk of such design and the feasibility of safer alternatives." *Id.* at 8. While Mr. Ratcliffe concedes that "consumer expectations may be considered," he counters that "consumer expectations do not play a determinative role," and "[t]he mere fact that a risk presented by a product design is open and obvious, or generally known, and that the product thus satisfies expectations, does not prevent a finding

that the design is defective." *Id.* at 9 (quoting RESTATEMENT (THIRD) OF TORTS: PRODS. LIAB. § 2 cmt. g (AM. L. INST. 1998)).

Here, Mr. Ratcliffe avers, BRP "did not inform Ratcliffe or the public that the window nets it designed and sold as an accessory for the Maverick X3 had a safety purpose until on or about July 21, 2020," despite the fact that "BRP was aware it could feasibly manufacture the Maverick X3 with window nets as standard equipment in 2018 and 2019." *Id.* at 10.

In Mr. Ratcliffe's view, this case is analogous to the Maine Supreme Judicial Court's (Law Court) decision in *Marois v. Paper Converting Machine Co.*, 539 A.2d 621 (Me. 1988), which upheld a jury verdict against the defendant manufacturer on a design defect claim on the theory that "a plaintiff may be aware of a dangerous area on a machine that could foreseeably injure his hand, but not recognize that his hand may be drawn into that area and injured." *Id.* at 10 (citing *Marois*, 539 A.2d at 624). Mr. Ratcliffe casts his situation as similar to *Marois* because he "was aware that he had purchased and was operating a vehicle with a roll cage and without window nets," but he "was not aware that during a rollover he would instinctually or reflexively extend his arm through the open window." *Id.* at 12.

Mr. Ratcliffe also takes issue with BRP's reliance on *Burns v. Architectural Doors and Windows*, 2011 ME 61, 19 A.3d 823, suggesting that "the facts and travel in *Burns* do not remotely resemble the facts and travel here." *Id.* at 15. In Mr. Ratcliffe's view, the plaintiff in *Burns*, who sustained injuries as a result of being struck by a closing garage door, "failed to make proper allegations of a design defect

in the door, and then failed to offer any argument or evidence of a design defect in the door." *Id.* at 12, 14.  Mr. Ratcliffe further notes that the evidence in *Burns* "showed that [the] plaintiff had known about the door's closing mechanism (its dangerous condition) for three years and that he had walked in and out of the garage several times a day during that timeframe." *Id.* at 14.  Finally, Mr. Ratcliffe contends that the *Burns* plaintiff "did not sue the company that designed, manufactured, or distributed the closing mechanism." *Id.* (emphasis omitted).

Turning to his failure-to-warn theory, Mr. Ratcliffe contends that "BRP failed to warn Plaintiff that he may reflexively extend his arm to brace a rollover, and failed to inform Plaintiff of the important safety purpose and benefit of BRP's accessory window nets." *Id.* at 16.  Quoting the Law Court, Mr. Ratcliffe declares that "[a] manufacturer has a responsibility to inform users and consumers of dangers about which he either knows or should know at the time the product is sold." *Id.* at 17 (quoting *Bernier v. Raymark Indus., Inc.*, 516 A.2d 534, 540 (Me. 1986)).  In Mr. Ratcliffe's view, "[a] jury will be able to find that BRP designed the Maverick X3's window nets for a safety purpose similar to that described in the Tucker Patent and yet BRP failed to market its accessory nets to the public as an important safeguard against limb injuries, until approximately two years after they were first sold." *Id.*

Mr. Ratcliffe further argues that, had he been warned about the possibility of his arm reflexively extending outside the roll cage, he "would not have operated the vehicle without window nets or wrist restraints." *Id.* at 18.  As such, Mr. Ratcliffe asserts that "[t]here is ample evidence that BRP's failure to adequately warn its

customers of the Maverick X3's dangerous condition, or adequately (or even truthfully) inform them of the safety purpose of the window nets, was unreasonable, reckless, and proximately caused Plaintiff's injures." *Id.*

Mr. Ratcliffe then endeavors to distinguish the cases BRP cited in support of its argument that Mr. Ratcliffe has not proven causation. According to Mr. Ratcliffe, in *Koken v. Black & Veatch Construction, Inc.*, 426 F.3d 39 (1st Cir. 2005), the welder would have consulted his foreman had he received an adequate warning, however, there was no evidence of how the foreman would have responded in such a consultation. *Id.* (citing *Koken*, 426 F.3d at 49). Here, Mr. Ratcliffe contends "there is evidence that had [he] been warned that his arms may involuntarily extend outside of the vehicle in the event of a rollover, then he would not have operated the vehicle without window nets or wrist restraints." *Id.* at 18-19.

Regarding *Pottle v. Up-Right, Inc.*, 628 A.2d 672 (Me. 1993), the other case BRP cited, Mr. Ratcliffe contends that the Law Court in *Pottle* "found evidence that the subject scaffold had inadequate warnings regarding its locking mechanism." *Id.* at 19. Here, Mr. Ratcliffe argues, "there are expert opinions that BRP's warnings inadequately warned operators or occupants that their arms may reflexively extend outside of the vehicle during a roll-over." *Id.* at 19. In Mr. Ratcliffe's view, BRP's warnings "should have been specific to this dangerous condition." *Id.* at 20.

In conclusion, Mr. Ratcliffe observes that "BRP's warnings presuppose that an ordinary operator will be able to follow them in a rollover event, but a jury may find that [an] ordinary operator or occupant of the Maverick X3 could not reasonably

follow BRP's instructions during a rollover event." *Id.* at 20.  Therefore, Mr. Ratcliffe declares, "BRP should not be allowed summary judgment on Plaintiff's failure to warn claims." *Id.*

### C. BRP U.S. Inc.'s Reply

Beginning with Mr. Ratcliffe's failure-to-warn theory, BRP insists that "there exists no record evidence that Plaintiff's accident would have been avoided had BRP provided some new or different warning." *BRP's Reply* at 2.  BRP acknowledges Mr. Ratcliffe's argument that it should have warned that occupants may reflexively extend their limbs outside the roll cage, but counters that "even if BRP had adopted Plaintiff's proposed language or something else entirely, no warning that BRP could have given would have prevented Plaintiff from 'reflexively' and 'instinctually' placing his arm outside the vehicle." *Id.* at 2-3.

BRP accuses Mr. Ratcliffe of attempting "to salvage his warnings claim by submitting a self-serving affidavit prepared after BRP moved for summary judgment." *Id.* at 3 (emphasis omitted).  Arguing that the Court "may not consider an affidavit that is nothing more than an attempt to manufacture an issue of fact in order to survive summary judgment," BRP urges the Court to discard Mr. Ratcliffe's statements of material fact that rely on his affidavit. *Id.* at 3-4 (quoting *Verrier v. BlueTriton Brands, Inc.*, No. 2:20-cv-00443-JAW, 2022 U.S. Dist. LEXIS 144116, at *74 (D. Me. Aug. 12, 2022)).  Even if the Court credits the affidavit, BRP continues, "the fact remains that nothing in the record evidence would allow a reasonable juror to conclude that, had BRP provided yet another warning regarding the potential for

the Subject Vehicle to overturn and the importance of keeping limbs inside the occupant compartment, Plaintiff would have operated the vehicle in a different manner or would have been able to resist the 'instinctual' urge to place his arm outside the window." *Id.* at 4.

Turning to Mr. Ratcliffe's design defect theory, BRP initially notes that "[w]hile it is true that, generally, whether a product is defective in design will require an analysis of the risks and utilities of the product at issue compared to some ostensibly safer, feasible alternative design, the law does not provide a remedy in cases, like this one, where Plaintiff received exactly what he bargained for." *Id.* at 1.

BRP then attempts to distinguish *Marois*, the case Mr. Ratcliffe relies on. BRP first avers that "the issue before the court in *Marois* was whether an alleged defect caused the plaintiff's injuries, not whether a defect existed in the first instance." *Id.* at 5 (citing *Marois*, 539 A.2d at 621). BRP further contends that "the circumstances that permitted a jury to reach a finding of defect in *Marois*—that the 'specific danger of the machine's design and clearing process was not obvious to, or known by, the [p]laintiff'—are not applicable to this case, as Plaintiff here was well aware of the risk of rollovers, the need to keep his arms inside the vehicle, the lack of window nets on the Subject Vehicle, and the availability of webbing as either an aftermarket accessory or as already installed on other vehicles present on Tidd's lot." *Id.* (quoting *Marois*, 539 A.2d at 624).

In conclusion, BRP argues that "the record evidence shows that the Subject Vehicle was precisely what Plaintiff contemplated when he bought it," and "Maine law does not afford Plaintiff a remedy under the facts presented." *Id.*

## IV.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations,

42

improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## V.   DISCUSSION

### A.   Post-Deposition Affidavits in Opposition to Summary Judgment

At the outset, the Court considers BRP's objections to Mr. Ratcliffe's submission of a post-deposition affidavit as factual support for some of his statements of additional material fact. Specifically, BRP objects that "Plaintiff's affidavit is improper and should be struck from the record because it misstates the factual record and was drafted after BRP moved for summary judgment." DRPSAMF ¶¶ 59-66, 72. BRP expands on this objection in its reply, which describes Mr. Ratcliffe's affidavit as "a self-serving affidavit prepared *after* BRP moved for summary judgment" representing Mr. Ratcliffe's attempt "to walk back deposition testimony." *BRP's Reply* at 3 (emphasis in original). BRP maintains that the Court "may not consider an affidavit that is nothing more than an attempt to manufacture an issue of fact in order to survive summary judgment." *Id.* (quoting *Verrier v. BlueTriton Brands, Inc.*, No. 2:20-cv-00443-JAW, 2022 U.S. Dist. LEXIS 144116, at *74 (D. Me. Aug. 12, 2022)). Further, BRP insists that a motion for summary judgment cannot "be

defeated by a sworn statement that 'merely reiterate[s] allegations made in the complaint, without providing specific factual information made on the basis of personal knowledge.'" *Id.* (alteration in original) (quoting *Verrier*, 2022 U.S. Dist. LEXIS 144116, at *74).

In response, Mr. Ratcliffe contends that "it is proper for a non-moving party to respond to a motion for summary judgment with an affidavit" under Federal Rule of Civil Procedure 56(c)(4). *Pl.'s Reply to DRPSAMF* at 2. Mr. Ratcliffe further argues that BRP does not "claim that the affidavit is deficient under Rule 56(c)(4)," but instead "claims that the affidavit 'misstates the factual record' without actually citing anything in the record which is purportedly misstated or contradicted." *Id.* (quoting DRPSAMF ¶¶ 59-66, 72). According to Mr. Ratcliffe, BRP's objection is "unfounded, without basis in fact, and in violation" of District of Maine Local Rule 56(d), which requires parties to support "each denial or qualification [of a statement of material fact] by a record citation." *Id.* (quoting D. ME. LOC. R. 56(d)).

The Court recently addressed the use of affidavits in opposition to motions for summary judgment in *Tucker v. Lantmännen Unibake USA, Inc.*, No. 2:21-cv-00087-JAW, 2023 U.S. Dist. LEXIS 222363 (D. Me. Dec. 14, 2023). Quoting *Verrier*, the case cited by BRP in support of its objection, the Court observed that "Rule 56 of the Federal Rules of Civil Procedure states that a party may use an affidavit 'to support or oppose a motion [for summary judgment]' if the affidavit is 'made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant . . . is competent to testify on the matters stated.'" *Id.* at *9-10 (alterations in

original) (quoting *Verrier*, 2022 U.S. Dist. LEXIS 144116, at *73 (quoting FED. R. CIV. P. 56(c)(4))).  The Court also cautioned that "a party's use of an affidavit is restricted only 'under limited circumstances.'"  *Id.* at *11 (quoting *Verrier*, 2022 U.S. Dist. LEXIS 144116, at *73).  Specifically, 1) the affiant must have given "clear answers to unambiguous questions," 2) the affidavit must contradict the witness's previous statements, and 3) the affiant must not have given a "satisfactory explanation of why the testimony is changed."  *Id.* (quoting *Verrier*, 2022 U.S. Dist. LEXIS 144116, at *73-74).

The Court further clarified that "[a] subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment."  *Id.* (alteration in original) (quoting *Verrier*, 2022 U.S. Dist. LEXIS 144116, at *75 (quoting *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 26 (1st Cir. 2002))).  A party objecting to a post-deposition affidavit at the summary judgment stage must show that the affidavit contradicts earlier deposition testimony: "[a]lthough the First Circuit has found the timing of the execution of a post-deposition affidavit probative of ill motive, it has not held that a district court may strike a post-summary judgment affidavit solely based on when the affidavit was filed, without evidence of a contradiction between the testimony."  *Id.* at *12 (quoting *Verrier*, 2022 U.S. Dist. LEXIS 144116, at *76-77).  "[T]he First Circuit has repeatedly held that a 'party's own affidavit, containing relevant information of which [s]he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.'"

*Id.* (quoting *Velázquez-García v. Horizon Lines of P.R., Inc.*, 473 F.3d 11, 18 (1st Cir. 2007)).

Although BRP broadly asserts that Mr. Ratcliffe's affidavit "misstates the factual record" and represents an attempt "to walk back deposition testimony," it fails to show how the specific statements in the affidavit contradict Mr. Ratcliffe's earlier testimony. BRP's discussion of Mr. Ratcliffe's deposition testimony is limited to claims that Mr. Ratcliffe admitted "to reading warning labels that specifically advised of the risk of rollovers and the need to keep all limbs inside the vehicle" and "described a conversation with a Tidd's sales representative where he was 'asking about the rollovers.'" *BRP"s Reply* at 3 (quoting *Stipulated R.*, Attach. 8, *Dep. of Stephen J. Ratcliffe* at 149:7 (*S. Ratcliffe Dep.*)). However, these portions of Mr. Ratcliffe's deposition testimony do not contradict his affidavit, making them an insufficient basis for an objection to the affidavit.

BRP is correct that Mr. Ratcliffe testified at his deposition that he was familiar with written warnings on the Subject Vehicle and in the operator's manual instructing occupants not to stick their arms outside the vehicle during a rollover. *S. Ratcliffe Dep.* at 45:7-46:17. But Mr. Ratcliffe's affidavit does not mention written warnings at all, nor does it suggest that Mr. Ratcliffe was never told to keep his arms inside the vehicle in the event of a rollover. As such, the affidavit does not "clearly contradict[]" Mr. Ratcliffe's "clear answers to unambiguous questions." *Calantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994).

Likewise, although Mr. Ratcliffe's affidavit discusses a conversation between Mr. Ratcliffe and Richard Tidd regarding the Subject Vehicle's potential to roll, the affidavit expands on Mr. Ratcliffe's deposition testimony by providing more specific details about the conversation.  This is clearly permissible.  *See Gillen*, 283 F.3d at 26 ("A subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment").  Therefore, the Court concludes that BRP has failed to show that Mr. Ratcliffe's affidavit contradicts his prior deposition testimony.

BRP cannot avoid this failure by suggesting that, as a whole, the affidavit represents Mr. Ratcliffe's attempt to show that he "was not aware of the risk of rollovers with the Subject Vehicle and the need to keep his arms inside the vehicle." *BRP's Reply* at 3.  As the Court has explained, an affidavit is only improper at the summary judgment stage if it "contradicts clear answers to unambiguous questions in an earlier deposition." *Gillen*, 283 F.3 at 26.  Regardless of how BRP views Mr. Ratcliffe's affidavit, it has failed to show a contradiction with his deposition testimony.  The Court overrules BRP's objections and accepts Mr. Ratcliffe's affidavit for purposes of the present motion.

### B.    Stephen J. Ratcliffe's Design Defect Claim Against BRP U.S. Inc.

Mr. Ratcliffe advances two theories of liability in support of his negligence and strict liability claims.[18]  First, he maintains that the Subject Vehicle suffered from a

---

[18]    Mr. Ratcliffe's strict liability cause of action arises under Maine's strict liability statute, 14 M.R.S. § 221, which provides:

47

design defect. *See Compl.* ¶¶ 21, 32; *Pl.'s Opp'n to BRP's Mot.* at 1 ("[T]here is *prima facie* evidence that a design defect (or defects) proximately caused this accident"). Second, he avers that BRP failed to warn him about the risks associated with using the Subject Vehicle. *Compl.* ¶¶ 22, 39; *Pl.'s Opp'n to BRP's Mot.* at 1 ("[T]here is . . . *prima facie* evidence that inadequate warnings also proximately caused this accident").

Even though Mr. Ratcliffe alleges two causes of action, his design defect theory can be analyzed the same way for purposes of the present motion. The Maine Supreme Judicial Court (Law Court) has "noted that '[i]n actions based upon defects in design, negligence and strict liability theories overlap in that under both theories the plaintiff must prove that the product was defectively designed thereby exposing the user to an unreasonable risk of harm." *Canning v. Broan-Nutone, LLC*, 480 F. Supp. 2d 392, 410 (D. Me. 2007) (quoting *Stanley v. Schiavi Mobile Homes, Inc.*, 462 A.2d 1144, 1148 (Me. 1983)); *accord Guiggey v. Bombardier*, 615 A.2d 1169, 1171 (Me. 1992). "Such proof will involve an examination of the utility of [the product's] design, the risk of the design and the feasibility of safer alternatives." *Stanley*, 462 A.2d at 1148.

---

One who sells any goods or products in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods, or to his property, if the seller is engaged in the business of selling such a product and it is expected to and does reach the user or consumer without significant change in the condition in which it is sold. This section applies although the seller has exercised all possible care in the preparation and sale of his product and the user or consumer has not bought the product from or entered into any contractual relation with the seller.

With respect to Mr. Ratcliffe's design defect theory, the parties disagree that Mr. Ratcliffe can establish the Subject Vehicle "was defectively designed thereby exposing [him] to an unreasonable risk of harm." *See Schiavi*, 462 A.2d at 1148. Specifically, they dispute whether Mr. Ratcliffe was aware of the Subject Vehicle's allegedly defective condition at the time he purchased it.[19]

The Law Court has repeatedly noted that Maine's strict liability statute, 14 M.R.S. § 221, was modeled after section 402A of the *Restatement (Second) of Torts*. *See, e.g., Austin v. Raybestos-Manhattan, Inc.*, 471 A.2d 280, 286 (Me. 1984) ("Maine's section 221 derives almost verbatim from the black letter of section 402A of the *Restatement (Second) of Torts* (1965)"); *Bernier v. Raymark Indus., Inc.*, 516 A.2d 534, 537-38 (Me. 1986) ("The Legislature formulated section 221 directly from section 402A of the *Restatement (Second) of Torts* (1965)"); *Estate of Pinkham v. Cargill, Inc.*, 2012 ME 85, ¶ 13, 55 A.3d 1, 5-6 ("We have previously noted that Maine's strict liability statute was fashioned after the Restatement (Second) of Torts § 402A

---

[19]     In their filings, the parties grounded their arguments in different versions of the Restatement of Torts. *Compare BRP's Mem. of Law* at 12-13 (discussing comment g to *Restatement (Second) of Torts* § 402A), *with Pl.'s Mem. of Law* at 9 (discussing comment g to *Restatement (Third) of Torts: Products Liability* § 2).

However, when questioned by the Court on April 30, 2024, both counsel disavowed any claim that the distinctions between Restatements Second and Third make a difference in the resolution of this motion.  In response to the Court's questioning, BRP's counsel, Attorney Trischler, responded, "I think I am arguing that the second restatement applies and bars the suit." *Oral Arg. Tr.* at 15:16-17. In response to the Court's question as to whether it matters if the Second or Third Restatement has been adopted in Maine, Mr. Ratcliffe's counsel, Attorney Mega, replied, "I don't think it matters at all. I don't believe that there's a case from the Maine Supreme Court which says they've adopted the third restatement, obviously, or else that would be in the brief. . . . But it makes no difference." *Id.* at 32:13-33:2.

As the parties agree that the Second Restatement applies, the Court does not reach whether the Third Restatement could apply in Maine and, if so, whether the distinctions between the two Restatements would make a difference in the resolution of this motion.

(1965)").  Accordingly, when the legislative history of 14 M.R.S. § 221 is silent as to an issue of statutory interpretation, the Law Court looks to the comments to section 402A of the Second Restatement for guidance.  *See Bernier*, 516 A.2d at 538 ("Since section 221 and its legislative history does not have anything to say . . . the commentary to section 402A is an appropriate place to begin our analysis"); *Estate of Pinkham*, 2012 ME 85, ¶¶ 13-15, 55 A.3d at 6 (reviewing the comments for guidance because "in enacting section 221, the Legislature intended to align itself with the Restatement's objectives").

Relevant here, the Law Court has relied on comment g to section 402A when discussing how consumer expectations affect design defect claims.  Comment g provides in part that "[t]he rule stated in this Section applies *only* where the product is, at the time it leaves the seller's hands, *in a condition not contemplated by the ultimate consumer*, which will be unreasonably dangerous to him."  RESTATEMENT (SECOND) OF TORTS § 402A cmt. g (AM. L. INST. 1965) (emphasis supplied).

In *Burns v. Architectural Doors and Windows*, 2011 ME 61, 19 A.3d 823, the Law Court adjudicated a products liability claim brought by an automotive repair shop mechanic, who was struck on the head by a closing garage door.  2011 ME 61, ¶¶ 2-4, 19 A.3d at 825.  At the time of the accident, the mechanic had worked at the repair shop for three years, and he testified that "it was obvious to him that when a garage door was closing, it would not stop if it hit a person or an object" and that "he had seen vehicles struck by a closing door on at least two occasions."  *Id.* ¶ 5, 19 A.3d at 825.  The mechanic initially proceeded under a design defect theory, alleging that

"the garage door was in a defective condition unreasonably dangerous to the ultimate user or consumer of the door because it did not have a mechanism that would cause it to stop or reverse if it encountered an object." *Id.* ¶ 6, 19 A.3d at 825. However, "[b]ecause neither of the defendants manufactured, designed, or sold the door *operator*," the trial court dismissed the mechanic's design defect theory at the summary judgment stage. *Id.* ¶ 9, 19 A.3d at 826 (emphasis in original).

On appeal to the Law Court, the mechanic argued that "he should have been permitted to offer evidence and argument of a design defect, because the garage door that struck him was defective 'at the time it le[ft] the seller's hands.'" *Id.* ¶ 19, 19 A.3d at 828 (citation omitted) (quoting RESTATEMENT (SECOND) OF TORTS § 402A cmt. g). The Law Court rejected this contention, writing that, "[a]s comment g makes clear . . . an injured person can prevail in such a design defect claim only if the product left the seller's hands 'in a condition not contemplated by the ultimate consumer.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 402A cmt. g). Because "Burns understood how the door operator functioned throughout his employment at [the repair shop]," the Law Court concluded, "the door did not leave [the defendant's] hands 'in a condition not contemplated by the ultimate consumer.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 402A cmt. g).

The year after it decided *Burns*, the Law Court again favorably quoted comment g to section 402A of the Second Restatement in *Estate of Pinkham*, *supra*. In that case, the Law Court noted that the "Restatement comments define '[d]efective condition' as a product that is 'in a condition not contemplated by the ultimate

consumer.'" *Id.* ¶ 13, 55 A.3d at 6 (quoting RESTATEMENT (SECOND) OF TORTS §402A cmt. g).

Thus, the Law Court has twice invoked comment g to section 402A for the proposition that to succeed on a design defect claim a plaintiff must show the allegedly defective product was "in a condition not contemplated by the ultimate consumer." *See* RESTATEMENT (SECOND) TORTS § 402A cmt. g. Accordingly, the Court follows the Law Court's reasoning and concludes Mr. Ratcliffe can only prevail on his design defect theory if he can show that the Subject Vehicle left BRP's possession "in a condition not contemplated by the ultimate consumer." *Burns*, 2011 ME 61, ¶ 19, 19 A.3d at 828 (quoting RESTATEMENT (SECOND) OF TORTS § 402A cmt. g).

Mr. Ratcliffe contends he can make this required showing. Although he concedes he "was aware that he had purchased and was operating a vehicle with a roll cage and without window nets," he argues he "was not aware that during a rollover he would instinctually or reflexively extend his arm through the open window." *Pl.'s Opp'n to BRP's Mot.* at 12. At oral argument, Mr. Ratcliffe's counsel further maintained that the record contains no evidence Mr. Ratcliffe knew the significance of purchasing a UTV without window nets. *Oral Arg. Tr.* at 33:24-34:9. In Mr. Ratcliffe's view, while the record shows he wanted window nets, it is silent as to why he wanted them. *Id.* at 34:5-9. This in turn makes summary judgment improper, he argues, because there is a triable issue as to whether he fully understood the Subject Vehicle's condition. *Id.* at 34:5-21.

BRP disagrees. It argues that "the Subject Vehicle is precisely what Plaintiff contemplated it was when he saw it on the lot of Tidd's dealership." *BRP's Mot.* at 13. It further maintains that "[t]he record evidence demonstrates that, at the time he purchased the Subject Vehicle, [Mr. Ratcliffe] was aware of the availability of window nets; that the 2019 Maverick did not come with nets as standard equipment; that he considered nets to be [a] desirable feature; that other UTVs could be purchased with nets; and that aftermarket nets were available for the Subject Vehicle." *Id.* In BRP's view, Mr. Ratcliffe "was well aware of the risk of rollovers, the need to keep his arms inside the vehicle, [and] the lack of window nets on the Subject Vehicle." *BRP's Reply* at 5.

While the parties do not explicitly frame their arguments in these terms, resolution of their dispute turns on the proper meaning of "condition" in comment g to section 402A. BRP's argument interprets "condition" narrowly, suggesting Mr. Ratcliffe's awareness of the Subject Vehicle's lack of window nets, by itself, forecloses his ability to show the Subject Vehicle was in "a condition not contemplated by the ultimate consumer." *See* RESTATEMENT (SECOND) OF TORTS § 402A cmt. g. Mr. Ratcliffe, on the other hand, interprets "condition" broadly, arguing the Subject Vehicle was in "a condition not contemplated by the ultimate consumer" because he failed to appreciate the specific safety-related function of window nets and the injury risk associated with the absence of window nets. *See id.*

For guidance on this issue, the Court turns to *Burns*, the Law Court's most extensive discussion of comment g. *Burns* concerned garage door operators without

"a safety mechanism that would stop a door from closing if it encountered an obstruction." 2011 ME 61, ¶ 2, 19 A.3d at 825. In reciting the facts of the case, the Law Court noted that "[a]t the time of the accident, Burns had worked at [the repair shop] for three years, and he knew how the doors operated." *Id.* ¶ 4, 19 A.3d at 825. Burns "testified that it was obvious to him that when a garage door was closing, it would not stop if it hit a person or an object. In fact, he had seen vehicles struck by a closing door on at least two occasions." *Id.* Concluding Burns could not proceed under a design defect theory, the Law Court explained that "Burns understood how the door operator functioned throughout his employment at Whited." *Id.* ¶ 19, 19 A.3d at 828. In other words, the Law Court barred Burns' recovery not because he knew of the alleged defect, but because he knew how the alleged defect could injure him.

Here, the record establishes that Mr. Ratcliffe was aware of the Subject Vehicle's alleged design defect—its lack of window nets—at the time he bought it. Prior to purchasing the Subject Vehicle, Mr. Ratcliffe had ridden in UTVs with window nets. DSMF ¶ 18; PRDSMF ¶ 18. He had also conducted internet research on UTVs, during the course of which he observed and watched videos of UTVs equipped with window nets. DSMF ¶¶ 14-16; PRDSMF ¶¶ 14-16. Mr. Ratcliffe specifically researched the availability of aftermarket window nets that would fit the Subject Vehicle, and he discussed the availability of window nets with the salesperson at Tidd's. DSMF ¶ 19; PRDSMF ¶ 19. Mr. Ratcliffe even testified that, before purchasing the Subject Vehicle, he "knew that [window nets or webbing] was

something that [he] desired to have from what [he had] seen" and that the availability of window netting was "a high consideration" and "something [he] wanted." DSMF ¶¶ 21-22; PRDSMF ¶¶ 21-22.   Therefore, it is clear Mr. Ratcliffe consciously purchased a UTV without window nets.

What is not clear, however, is why Mr. Ratcliffe wanted window nets and whether he understood how he could be injured as a result of the Subject Vehicle's lack of window nets.  The record establishes that window nets serve a critical purpose: keeping occupants' limbs and other body parts inside a UTV's roll cage during a rollover.  BRP's own "Nascar style" nets successfully passed a test to determine whether they could "hold passenger body parts during [a] roll over."  PSAMF ¶¶ 82-84; DRPSAMF ¶¶ 82-84.  In addition, another UTV manufacturer, Honda, includes window nets as standard equipment for its Talon UTV, the owner's manual of which cautions operators:

> Your Honda SXS is equipped with side nets to prevent branches, or other debris from getting inside the driver's compartment, and to keep the driver's and passenger's hands and arms inside the occupant protective structure (OPS) if the vehicle ever tips or overturns.
>
> . . .
>
> Be sure the side nets are properly latched before driving your Honda SXS, and never remove side nets from the vehicle.

PSAMF ¶ 91; DRPSAMF ¶ 91.

Although there is evidence that the UTV industry, including BRP, was aware of the safety purpose of window nets, the record is silent as to whether Mr. Ratcliffe understood or was told this.  In fact, there is evidence Mr. Ratcliffe was misled about the function of window nets.  In 2019, the year Mr. Ratcliffe bought the Subject

Vehicle, BRP did not market its "Nascar nets" as having any safety related purpose. PSAMF ¶ 93; DRPSAMF ¶ 93.  Instead, BRP marketed the nets as providing "added protection from wind."  PSAMF ¶ 93; DRPSAMF ¶ 93.  Further, on July 29 or 30, 2019, an owner or employee of Tidd's told Mr. Ratcliffe that the window nets offered by BRP were "almost like a screen of a window . . . to keep dust and debris out."[20] PSAMF ¶ 95; DRPSAMF ¶ 95.  A reasonable jury could find that these representations informed Mr. Ratcliffe's understanding of the window nets, as the record reflects that he believed BRP's Can-Am accessory window nets were designed to keep dust and debris out of the vehicle, not to keep body parts inside.  PSAMF ¶ 62; DRPSAMF ¶ 62.

A reasonable factfinder could also conclude that Mr. Ratcliffe did not understand the peril posed by the Subject Vehicle's lack of window nets.  During the accident, Mr. Ratcliffe extended his left arm outside of the window area instinctually, reflexively, and without volition.  PSAMF ¶ 72; DRPSAMF ¶ 72.  As a result, his left arm was almost severed off by the Subject Vehicle's roll bar.  PSAMF ¶ 71; DRPSAMF ¶ 71; *see also* DSMF ¶ 8; PRDSMF ¶ 8 (quoting Dr. Nobilini's statement that "Plaintiff's injuries were consistent with his left forearm being crushed between the driver's side rail of the [rollover protective structure] and the ground during the subject rollover event").

---

[20]    At oral argument, counsel for BRP argued that any representations made by Tidd's are not legally binding on BRP.  *Oral Arg. Tr.* at 21:14-18.  The Court includes this statement, and other statements by Tidd's, in its analysis not because they are binding on BRP, but to show that a reasonable factfinder could conclude they informed Mr. Ratcliffe's understanding.

Mr. Ratcliffe's experts agree that his reflexive arm movement was a natural and foreseeable protective response.  *See* PSAMF ¶ 73; DRPSAMF ¶ 73 (explaining Dr. Nobilini's conclusions); PSAMF ¶ 75; DRPSAMF ¶ 75 (describing Dr. Batzer's observations); PSAMF ¶ 100; DRPSAMF ¶ 100 (reproducing Dr. Lenorovitz's report). Yet there is no evidence in the record that Mr. Ratcliffe knew he would instinctively respond to a rollover event in this way, or that his instincts would lead to such dire consequences.  In fact, Mr. Ratcliffe stated in his affidavit that when he purchased the Subject Vehicle, he did *not* believe his arm would instinctually or reflexively extend out the open window.  PSAMF ¶ 63 (emphasis supplied); DRPSAMF ¶ 63.

Further, there is other evidence in the record that Mr. Ratcliffe did not fully appreciate the Subject Vehicle's propensity to roll.  During his research on UTVs, Mr. Ratcliffe watched numerous videos of Maverick X3 drivers performing maneuvers, including donuts, without incident of rollover and in vehicles that did not appear to be equipped with window nets.  PSAMF ¶ 60; DRPSAMF ¶ 60.  Additionally, in response to Mr. Ratcliffe's concerns about the Subject Vehicle rolling, Mr. Tidd represented that the Maverick X3 was unlikely to roll because it had a "low center of gravity," and to roll it a driver would "have to get really nuts with it."  PSAMF ¶ 59; DRPSAMF ¶ 59.  Therefore, the record at least suggests Mr. Ratcliffe was misinformed about the risk of injury that accompanied operating the Subject Vehicle without window nets.

Viewing the evidence in the light most favorable to Mr. Ratcliffe, as it must, the Court concludes that a reasonable jury could find that, although Mr. Ratcliffe

consciously purchased the Subject Vehicle without window nets, he did not appreciate (and may have been misled about) the safety purpose of window nets, how the lack of window nets could injure him or the likelihood that he would be injured. Such a finding would distinguish the present case from *Burns*. Whereas the plaintiff in *Burns* "understood how the door operator functioned," 2011 ME 61, ¶ 19, 19 A.3d at 828, the record here suggests Mr. Ratcliffe did not understand how the absence of window nets would render the Subject Vehicle unsafe. As a result, a jury could find that the Subject Vehicle left BRP's hands "in a condition not contemplated by the ultimate consumer." RESTATEMENT (SECOND) OF TORTS § 402A cmt. g. The Court denies BRP's motion for summary judgment on Mr. Ratcliffe's design defect theory.

### C.      Stephen J. Ratcliffe's Failure-to-Warn Claim against BRP U.S. Inc.

As a threshold matter, Mr. Ratcliffe's failure-to-warn theory is similar to his design defect theory in that "[r]egardless of whether a 'failure to warn claim is phrased in terms of negligence [or] strict liability, the analysis . . is basically the same." *Pottle v. Up-Right, Inc.*, 628 A.2d 672, 675 (Me. 1993) (second and third alterations in original) (quoting *McNeal v. Hi-Lo Powered Scaffolding, Inc.*, 835 F.2d 637, 641 (D.C. Cir. 1988)). "[T]he general rule [is] is that the supplier of a product is liable to expected users for harm that results from foreseeable uses of the product if the supplier has reason to know that the product is dangerous and fails to exercise reasonable care to so inform the user." *Id.* (quoting *McNeal*, 835 F.2d at 641). Therefore, the Court does not differentiate between Mr. Ratcliffe's negligence and strict liability claims in its failure-to-warn analysis.

"A products liability action for failure to warn requires a three-part analysis: (1) whether the defendant held a duty to warn the plaintiff; (2) whether the actual warning on the product, if any, was inadequate; and (3) whether the inadequate warning proximately caused the plaintiff's injury." *Koken v. Black & Veatch Constr., Inc.*, 426 F.3d 39, 45 (1st Cir. 2005) (quoting *Pottle*, 628 A.2d at 675) (applying Maine law). "The plaintiff bears the burden of proof on each of these elements." *Id.* (citing *Bouchard v. Am. Orthodontics*, 661 A.2d 1143, 1145 (Me. 1995)).

The Law Court has explained that "a duty to warn arises when the manufacturer knew or should have known of a danger sufficiently serious to require a warning." *Pottle*, 628 A.2d at 675. Further, "when a duty to warn exists, the warning must advise the user of the risks associated with its product and offer the user specific directions for the product's safe use." *Id.* Finally, for a plaintiff to recover on a failure-to-warn theory, "the manufacturer's failure to provide an adequate warning must be a substantial factor in bringing about the plaintiff's injury." *Id.*

Of these three elements, BRP only contests the third element, causation.[21] In BRP's view, Mr. Ratcliffe's failure-to-warn theory is a nonstarter because "Plaintiff cannot show that, had BRP provided another or a different warning regarding the inherent risk of rollovers and the need for occupants to keep their arms and legs

---

[21] In its reply, BRP declares it "did not seek summary judgment on the basis that its warnings should be considered adequate as a matter of law—though there certainly is an argument that they are." *BRP's Reply* at 2. In BRP's view, the "Rule 56 motion should be granted for the simple fact that, even if BRP had adopted Plaintiff's proposed language or something else entirely, no warning that BRP could have given would have prevented Plaintiff from 'reflexively' and 'instinctually' placing his arm outside the vehicle." *Id.*

inside the vehicle, his injury would have been prevented." *BRP's Mem. of Law* at 14. BRP further avers that "nothing in the record evidence would allow a reasonable juror to conclude that, had BRP provided yet another warning regarding the potential for the Subject Vehicle to overturn and the importance of keeping limbs inside the occupant compartment, Plaintiff would have operated the vehicle in a different manner or would have been able to resist the 'instinctual' urge to place his arm outside the window." *BRP's Reply* at 4.

Mr. Ratcliffe sees things differently. He suggests "[t]here is ample evidence that BRP's failure to adequately warn its customers of the Maverick X3's dangerous condition, or adequately (or even truthfully) inform them of the safety purpose of window nets, was unreasonable, reckless, and proximately caused Plaintiff's injuries." *Pl.'s Mem. of Law* at 18. Specifically, Mr. Ratcliffe argues that "there is evidence that had [he] been warned that his arms may involuntarily extend outside of the vehicle in the event of a rollover, then he would not have operated the vehicle without window nets or wrist restraints." *Id.* at 19.

After reviewing the summary judgment record, the Court concludes Mr. Ratcliffe has the better argument. "To survive a motion for summary judgment on a failure-to-warn claim, a plaintiff must show that an 'inadequate warning proximately caused the plaintiff's injury.'" *Novak v. Mentor Worldwide LLC*, 287 F. Supp. 3d 85, 95 (D. Me. 2018) (quoting *Pottle*, 628 A.2d at 675). Mr. Ratcliffe has made such a showing, as the record would permit a reasonable juror to find that he would not have

operated the Subject Vehicle without window nets or wrist restraints had he received a different warning.

"A proximate cause is 'a cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the result would not have occurred.'" *Higgins v. Huhtamaki, Inc.*, No. 1:21-cv-00369-JCN, 2023 U.S. Dist. LEXIS 179566, at *26 (D. Me. Oct. 5, 2023) (quoting *Holmes v. E. Me. Med. Ctr.*, 2019 ME 84, ¶ 17, 208 A.3d 792, 798). "The question of whether a defendant's acts or omissions were the proximate cause of a plaintiff's injuries is generally a question of fact, and a judgment as a matter of law is improper if any reasonable view of the evidence could sustain a finding of proximate cause." *Houde v. Millett*, 2001 ME 183, ¶ 11, 787 A.2d 757, 759. However, "[a] defendant is entitled to a summary judgment if there is so little evidence tending to show that the defendant's acts or omissions were the proximate cause of the plaintiff's injuries that the jury would have to engage in conjecture or speculation in order to return a verdict for the plaintiff." *Id.*

In arguing that it is entitled to summary judgment, BRP focuses on Mr. Ratcliffe's deposition testimony that "he 'instinctually' tried to brace himself when he felt the vehicle begin to tip." *BRP's Mot.* at 2. Specifically, BRP finds support for its position in Mr. Ratcliffe's statement that "when your body is falling, right, it's almost an involuntary reaction for you to want to brace yourself, right? And you know, someone could instruct me a thousand times over, and I think, knowing my body and my reflexes, I would instinctually want to brace myself from falling when I feel my

61

body falling." PSMF ¶ 42; PRDSMF ¶ 42. BRP also cites the following exchange from

Mr. Ratcliffe's deposition:

> Q: So do you remember reading or being instructed that if you think the
> vehicle may tip or roll, the driver should keep both hands on the steering
> wheel and the left foot planted on the footrest?
> A: I'll go back to my last answer to answer that, right? Sure, I may have
> read that, but it's -- you're talking about a conscious decision versus an
> involuntary, you know, reaction.

DSMF ¶ 43; PRDSMF ¶ 43. Taken together, BRP argues these statements should be

read to mean that no warning could have prevented Mr. Ratcliffe from reflexively

extending his arm outside the Subject Vehicle's roll cage when he felt it begin to tip.

The problem with BRP's argument is that these statements are not the only

evidence of causation in the summary judgment record. The record contains evidence

that at the time Mr. Ratcliffe purchased the Subject Vehicle, he did not believe either

that the Subject Vehicle would abruptly roll during a turn or that his arm would

reflexively extend outside of the roll cage during a rollover. PSAMF ¶ 62; DRPSAMF

¶ 62. In his affidavit, Mr. Ratcliffe further asserts that had he known about these

variables, he would not have operated the Subject Vehicle without nets or wrist

restraints. PSAMF ¶ 66; DRPSAMF ¶ 66. As Mr. Ratcliffe's expert, Dr. David

Lenorovitz, explained, either window nets or wrist restraints might have prevented

Mr. Ratcliffe's injuries:

> The best you can do when designing or engineering an equipment
> system in which such reactionary limb movements are likely . . . is to
> incorporate some type of guard, shield, or restraint mechanism to
> preclude the limb (hand/arm) from accidentally/involuntarily moving
> into harm's way. The NASCAR-like window net that Mr. Ratcliffe
> had requested is (should be) intended to provide just such an economical
> ($46) but effective type of protection. Another racecar-inspired
> economical ($17) solution is a simple wristband that attaches to the

> driver's left wrist and to his seat belt . . .. Had BRP provided either of
> these devices as standard equipment safety measures (i.e., not as after-
> market, extra-cost accessory items), it is likely that Mr. Ratcliffe would
> not have sustained the costly injury that he did.

PSAMF ¶ 100; DRPSAMF ¶ 100. Therefore, BRP is incorrect in arguing that "no warning that BRP could have given would have prevented Plaintiff from 'reflexively' and 'instinctually' placing his arm outside the vehicle."[22] *BRP's Reply* at 2-3. Put differently for purposes of the pending motion, there is a factual issue as to whether a proper warning would have prevented the injuries Mr. Ratcliffe sustained. On this record, even if a jury could find the facts as BRP proposes them, this does not foreclose the reasonable possibility that a jury could find the facts as Mr. Ratcliffe sees them.

Based on the record before it, the Court determines that a reasonable juror could find that had Mr. Ratcliffe been warned of the potential that he would reflexively extend his arm outside the roll cage during a rollover, he would not have operated the Subject Vehicle without restraints that could have prevented his injury. Accordingly, the Court concludes that BRP is not entitled to summary judgment because a reasonable juror could find that Mr. Ratcliffe has shown "that an inadequate warning proximately caused the complained-of harm." *See Novak*, 287 F. Supp. 3d at 95 (quoting *Pottle*, 628 A.2d at 675). Because Mr. Ratcliffe has presented sufficient evidence to allow a reasonable juror to find in his favor on all three elements

---

[22]    At oral argument, counsel for BRP maintained that Mr. Ratcliffe's failure-to-warn claim is also undercut by the contents of Mr. Ratcliffe's expert reports, which purportedly state that no warning would have prevented his injuries. *Oral Arg. Tr.* at 46:4-17. As an initial matter, the Court reads the portions of the expert reports quoted in the parties' statements of material fact as criticizing BRP's reliance on warnings for occupant safety. *See* PSAMF ¶¶ 73-75, 100; DRPSAMF ¶¶ 73-75, 100. The Court does not view these portions of the expert reports as saying that no warning would have prevented Mr. Ratcliffe's injuries. Additionally, to the extent other portions of the expert reports contradict Mr. Ratcliffe's statements, the Court views this as a factual issue best resolved by a jury.

of a failure-to-warn claim,[23] the Court denies BRP's motion for summary judgment as to Mr. Ratcliffe's failure-to-warn theory.

### D. Tidd's Sport Shop, Inc.'s Motion to Join BRP's Motion for Summary Judgment

Having concluded that BRP is not entitled to summary judgment on either of Mr. Ratcliffe's theories of recovery, the Court briefly addresses Tidd's request to join BRP's motion for summary judgment. *See Tidd's Mot.* at 1. Although Mr. Ratcliffe opposes Tidd's request, *see Pl.'s Opp'n to Tidd's Mot.*, the Court does not examine the contours of this dispute. As Tidd's seeks summary judgment "[f]or the same reasons set forth in BRP's motion papers," *Tidd's Mot.* at 1, and the Court considered and rejected BRP's arguments, the Court denies summary judgment to Tidd's. At trial, Mr. Ratcliffe may pursue his design defect and failure-to-warn theories against both BRP and Tidd's.

## VI.   CONCLUSION

The Court DENIES Defendant BRP U.S. Inc.'s Motion for Summary Judgment (ECF No. 123) and DENIES Defendant Tidd's Sports Shop, Inc.'s Motion for Summary Judgment (ECF No. 126).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 5th day of June, 2024

---

[23]   As noted above, BRP does not appear to contest that Mr. Ratcliffe established a triable issue as to the first two elements of a failure-to-warn claim. In fact, counsel for BRP conceded at oral argument that the record contains evidence that BRP's warnings were inadequate. *Oral Arg. Tr.* at 44:13-15. Having reviewed the record, the Court agrees with BRP that the first two elements are not at issue here, and for the sake of brevity, the Court has not discussed them.